Case No. 24-13294-C

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

C.B.,
Appellant-Plaintiff,

v.

NASEEB INVESTMENTS, INC.,
Appellee-Defendant.

---

Appeal from the United States District Court
for the Northern District of Georgia

## <u>Appellant-Plaintiff C.B.'s Principal Brief</u>

Matthew B. Stoddard
Belle-Anne Cooper
THE STODDARD FIRM
1534 N. Decatur Road NE
Atlanta, GA 30307
Tel: (470) 467-2200
*matt@legalhelpga.com*
*ba@legalhelpga.com*

Naveen Ramachandrappa
Amber D. Greenaway
BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW, Ste 3900
Atlanta, GA 30309
Tel: (404) 881-4100
*ramachandrappa@bmelaw.com*
*greenaway@bmelaw.com*

*Attorneys for Appellant-Plaintiff C.B.*

**<u>Certificate of Interested Persons & Corporate Disclosure Statement</u>**

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for Appellant-Plaintiff C.B.[1] certifies that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations (including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party) that have an interest in the outcome of this particular case or appeal:

- Amin, Nalini (Joint Owner of Appellee-Defendant)

- Amin, Vic (Joint Owner of Appellee-Defendant)

- Atkins, Sabrina Lynn (Counsel for Appellee-Defendant)

- Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. (Counsel for Movant Choice Hotels International Inc.)

- Beranek, Lori M. (Counsel for Movants U.S. Attorney's Office and Federal Bureau of Investigation)

- Bondurant, Mixson & Elmore LLP (Counsel for Appellant-Plaintiff)

---

[1] Pursuant to the district court's order, C.B. has permission to proceed without publicly revealing her name, subject to the district court revisiting the issue before trial. *See* R-4 (C.B.'s Mot. for Protective Order & Leave to Proceed Via Initials); Oct. 19, 2020 Order, By Docket Entry Only.

- Cartiga Consumer Funding, LLC (Funding for Appellant-Plaintiff)

- C.B. (Appellant-Plaintiff)

- Choice Hotels International, Inc. (Movant in District Court)

- Colette, Hervey Joseph (Counsel for Movant View Point Health)

- Cooper, Belle-Anne (Counsel for Appellant-Plaintiff)

- Federal Bureau of Investigation (Movant in District Court)

- Freeman Mathis & Gary, LLP (Counsel for Movant View Point Health)

- Gilmore, Tracy Anne (Counsel for Appellee-Defendant)

- Greenaway, Amber (Counsel for Appellant-Plaintiff)

- Harris, Roger E. (Counsel for Appellee-Defendant)

- Lee, Christopher Sue (Counsel for Movant View Point Health)

- Naseeb Investments, Inc. d/b/a The Hilltop Inn a/k/a Econolodge (Appellee-Defendant)

- Patel, Atul (Joint Owner of Appellee-Defendant)

- Patel, George (Joint Owner of Appellee-Defendant)

- Ramachandrappa, Naveen (Counsel for Appellant-Plaintiff)

- Stoddard, Matthew (Counsel for Appellant-Plaintiff)

- Swift, Currie, McGhee & Hiers, LLP (Counsel for Appellee-Defendant)

- The Stoddard Firm (Counsel for Appellant-Plaintiff)

- Totenberg, Hon., Amy (District Court Judge, N.D. Ga.)

- Tropper, Joshua (Counsel for Movant Choice Hotels International Inc.)

- Turner, Sara Marie (Counsel for Movant Choice Hotels International Inc.)

- United States Attorney's Office (Movant in District Court)

- View Point Health (Movant in District Court)

- Wagner, Kori (Counsel for Appellee-Defendant)

- WLG Atlanta, LLC (Counsel for Appellant-Plaintiff)

- Zabresky, Janelle (Counsel for Appellant-Plaintiff)[2]

Counsel for Appellant-Plaintiff C.B. further certifies that Choice Hotels International, Inc. (CHH) is a publicly traded company that potentially has an interest in the outcome of this case or appeal.

---

[2] Janelle Zabresky represented Appellant-Plaintiff C.B. while Ms. Zabresky was an associate at The Stoddard Firm. Ms. Zabresky, however, no longer actively represents Appellant-Plaintiff C.B., as she now works at a different law firm, WLG Atlanta. We list her as counsel only out of an abundance of caution.

## Statement Regarding Oral Argument

This appeal arises from a civil action by Appellant-Plaintiff C.B. against Appellee-Defendant Naseeb Investments, Inc. *See* R-13 at 3 (Am. Compl. ¶¶ 1-4).

As the district court explains, "[t]his case is one of a growing number of lawsuits in this district – and across the nation – involving claims that arise from sex trafficking at a hotel." R-164 (MSJ Order) at 1. "Similar to other plaintiffs in these cases, [C.B.] raises claims under 18 U.S.C. § 1595(a), which is sometimes referred to as the civil beneficiary provision of the Trafficking Victims Protection Reauthorization Act ('TVPRA')." *Id.* C.B. asserts civil-beneficiary claims against "Naseeb Investments, Inc. ('Naseeb'), which owns, operates, and manages the Hilltop Inn in Conley, Georgia." *Id.* "She contends [Naseeb] benefited from child sex trafficking crimes against her when her trafficker coercively held her and sold her for commercial sex acts on [Naseeb's] property in June 2010, when she was fifteen years old." *Id.* "This is clearly a dreadful case where a young teenage girl was manipulated and seriously sexually exploited and abused." *Id.* at 50.

After discovery, the district court "reluctantly conclude[d] that it must grant [Naseeb's] Motion for Summary Judgment." *Id.* at 3. It found that C.B. hadn't satisfied the second element (Naseeb's participation in a venture) and the fourth element (Naseeb's actual or constructive knowledge that the venture engaged in an act violating the TVPRA) of a civil-beneficiary claim. *Id.*

C.B. now appeals, and for at least three reasons, this Court should grant this request for and hear oral argument before deciding this appeal.

*First*, this appeal presents questions of first impression that this Court hasn't decided under its binding precedent. It appears that the Court hasn't issued binding precedent deciding any civil-beneficiary claim against a hotel *operator*—let alone binding precedent specifically addressing the second element (participation) and fourth element (knowledge) of a civil-beneficiary claim against a hotel operator.

True, the Court did say in *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021), that "renting a room to the abuser" is one of the "kinds of allegations [that] would establish a hotel operator's participation in a venture with a sex trafficker." *Id.* at 726; *see also id.* at 729 (Jordan, J., concurring). But that statement is admittedly non-binding *dictum*. That's because, in *Red Roof*, this Court decided only the Does' claims against the franchisors—not against the hotel operators.

The Court did also decide a civil-beneficiary claim against a hotel operator in *K. H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024) (unpublished). However, as "an unpublished, unargued Eleventh Circuit opinion," *Riti* also isn't binding precedent. *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235, 2024 WL 4204906, at *4 (E.D.N.C. Sept. 16, 2024); *see id.* (rejecting *Riti* as "atextual" and against "the greater weight of authority").

Without binding precedent from this Court and faced with conflicting non-

binding authority, district courts in this Circuit—including the district court in this action—are struggling with how to decide civil-beneficiary claims against hotel operators. *See, e.g.*, R-164 at 30 ("In *Riti*, though, the panel walked back *Red Roof*'s incorporation of *Ricchio*'s [a First Circuit opinion's] broader language regarding participation in a venture ...."). As the district court noted in its order in this action, "[t]he Circuit's more comprehensive revisiting of the statute would be helpful to the district courts handling these difficult issues." R-164 at 3 n.4.

Given that this appeal presents questions of first impression that this Court hasn't decided under binding precedent, the Court should hear oral argument to ensure that it fully understands the parties' arguments and can issue binding precedent that gives clear and accurate guidance. *Cf. Rose v. Hodges*, 423 U.S. 19, 26 (1975) (Brennan, J., dissenting) ("[T]he issue is one of first impression in this Court, and it surely merits briefing and oral argument.").

*Second*, if affirmed, the district court's answers to these questions of first impression would create a direct split between this Circuit and the Seventh Circuit. Specifically, the district court held that, "under the Eleventh Circuit's formulation," the knowledge element "appears to require actual or constructive knowledge *as to the trafficking of the individual plaintiff*, plus some degree of acceptance or welcome of that trafficking." R-164 at 46 (citing "*Riti*, 2024 WL 505063, at *4*"). The district court followed a "formulation" of the knowledge element from this

Court's unpublished decision in *Riti* and non-binding *dictum* from *Red Roof*—despite the district court's express recognition that the requirement "the defendant must have actual or constructive knowledge 'as to the plaintiff' **is not** in the statutory language." *Id.* at 40 n.30 (emphasis added).

In stark contrast, the Seventh Circuit, in binding precedent, has held that "we agree with the majority of courts that have addressed Section 1595's constructive-knowledge requirement that the statutory text does not require allegations and ultimately proof that the defendant knew or should have known of the specific victim." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 558 (7th Cir. 2023). "[A] plaintiff needs to allege plausibly that the defendant had constructive knowledge that a venture *generally* has violated Section 1591. Knowledge of the specific victim, let alone knowledge of her identity is not required." *Id.* (cite omitted).

Because this appeal could avoid or could create a circuit split, this Court should hear oral argument to ensure that it correctly decides this important issue. *See Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F.Supp.3d 464, 469 (E.D.N.C. 2024) (recognizing this potential "circuit split"). Briefs alone likely won't fully inform the Court. *See* David M. O'Brien, *Storm Center: The Supreme Court in American Politics* 260 (5th ed. 2000) (quoting Justice Scalia as observing that "[t]hings can be put in perspective during oral argument in a way they can't in a written brief").

*Third*, as the district court correctly observed, this action is just "one of a

growing number of lawsuits in this district – and across the nation – involving claims" against hotel operators. R-164 at 1. The district court's order alone cites to *seven* other civil actions filed in the Northern District of Georgia against hotel operators. *See id.* at 26 (citing *J.G. v. Northbrook Indus.*, No. 1:20-CV-5233, 2022 WL 4482735, at *3 (N.D. Ga. Aug. 2, 2022)); *id.* (citing *G.W. Northbrook Indus.*, No. 1:20-CV-5232, 2022 WL 1644923, at *2 (N.D. Ga. May 24, 2022)); *id.* at 28 n.23 (citing *I.R. v. I Shri Khodiyar, LLC*, 723 F.Supp.3d 1327, 1338 (N.D. Ga. 2024)); *id.* at 30 n.25 (citing *Doe (K.B.) v. G6 Hosp., LLC*, No. 1:23-CV-2597, 2023 WL 8650785, at *5 (N.D. Ga. Dec. 14, 2023)); *id.* at 32 (citing *Does 1-4 v. Red Roof Inns, Inc.*, 688 F.Supp.3d 1247, 1255 (N.D. Ga. 2023)); *id.* (citing *W.K. v. Red Roof Inns, Inc.*, 692 F.Supp.3d 1366, 1380 (N.D. Ga. 2023)); *id.* at 33 (citing *A.G. v. Northbrook Indus., Inc.*, No. 1:20-CV-5231, Doc. 151 (N.D. Ga. June 14, 2024)). And that's not even the full list of such actions in the Northern District of Georgia—let alone other districts in this Circuit and other circuits.

Given the sheer quantity of civil-beneficiary actions against hotel operators, any decision in this action will likely have a widespread impact on litigants and judges across many actions. Oral argument can help ensure that the Court doesn't overlook any important arguments. *Cf. Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (Stevens, J., dissenting) ("Whenever this Court acts summarily, there is an increased risk that it will make a mistake. Without the benefit of full

briefs and oral argument, an important issue may escape our attention.").

For those three reasons, as well as many other reasons, C.B. respectfully requests that the Court hear oral argument before deciding this appeal. As the district court itself concluded, "[t]he relative uniqueness of the factual issues in this case is challenging, but the issues posed in this case also suggest the need for further consideration of the rigid legal standards most recently adopted in [the non-binding, unpublished decision in] *Riti*." R-164 at 50.

## Table of Contents

Certificate of Interested Persons & Corporate Disclosure Statement.....................C-1

Statement Regarding Oral Argument ......................................................................... i

Table of Contents ..................................................................................................... vii

Table of Citations .......................................................................................................x

Statement of Jurisdiction....................................................................................... xiii

Statement of Issues.....................................................................................................1

Statement of Case.......................................................................................................2

    1.     Statement of Prior Proceedings ........................................................3

    2.     Statement of Facts .............................................................................4

          A.     The Hilltop Inn and Naseeb's Management ..............................4

          B.     Management's Denial of Sex Trafficking .................................6

          B.     Employee Reports of Rampant Sex Trafficking.......................6

               i.     Ricky Vaughn ...................................................................7

               ii.     Johnny Johnson.................................................................8

               iii.    Joan Blackmon................................................................10

          C.     Solomon Mustafa Trafficking Incidents ..................................12

          D.     Timothy Chappell and Trafficking of C.B................................13

                i.     Chappell begins living at the Hilltop Inn. .....................13

               ii.     Chappell meets 15-year-old C.B. through the internet. ...........................................................................13

   iii. Chappell rents a second room at the Hilltop Inn for C.B. ...................................................................14

   iv. Chappell sells sex with C.B. to three other men, and Chappell himself rapes C.B. ...................16

   v. C.B. escapes Chappell and the Hilltop Inn....................18

  3. Statement of Standard of Review........................................18

Summary of Argument ..................................................................19

Argument & Citations of Authority ..............................................20

 1. C.B. satisfied the second element—Naseeb's participation in a venture with C.B.'s trafficker, Chappell. .............................22

  A. The phrase "participation in a venture" must be given its plain meaning.................................................22

  B. Naseeb's room rentals to Chappell for six weeks satisfy the participation element.........................................23

  C. Nothing more than room rentals is required to show Naseeb's participation in a venture with Chappell. .................24

  D. Even if more were required, Naseeb directly assisted Chappell in other ways.............................................30

 2. C.B. satisfied the fourth element—Naseeb's knowledge that the venture engaged in an act violating the TVPRA................................31

  A. The phrase "knew or should have known" must be given its plain meaning. ...................................................31

  B. Naseeb should've known Chappell was engaged in trafficking.................................................................31

  C. Awareness that Chappell was specifically trafficking C.B. isn't required to show Naseeb's knowledge....................32

D.      Even if it were required, Naseeb also should've known
that Chappell was specifically trafficking C.B. ........................35

Conclusion ............................................................................................37

# Table of Citations

**U.S. Supreme Court Cases**

*Baldwin Cty. Welcome Ctr. v. Brown*,

    466 U.S. 147 (1984)...........................................................................v

*Rose v. Hodges*,

    423 U.S. 19 (1975)........................................................................... iii

**Eleventh Circuit Cases**

\*    *Doe #1 v. Red Roof Inns, Inc.*,

    21 F.4th 714 (11th Cir. 2021).........ii, iii, iv, 21- 23, 25, 26-27, 29, 31, 33, 35

*K. H. v. Riti, Inc.*,

    No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024)........ ii-iv, vi, 29-30

*Strickland v. Norfolk S. Ry. Co.*,

    692 F.3d 1151 (11th Cir. 2012) ....................................................18

**Other Federal Circuit Cases**

\*    *G.G. v. Salesforce.com, Inc.*,

    76 F.4th 544 (7th Cir. 2023)............................................. iv, 21, 26, 31, 34-35

*Ingram v. Comm'r of Soc. Sec. Admin*,

    496 F.3d 1253 (2007) ....................................................................33

*Ricchio v. McLean*,

    853 F.3d 553 (1st Cir. 2017)............................................................. iii, 27, 28

*United States v. Rubin*,

    609 F.2d 51 (2d Cir. 1979) ............................................................33

**Federal District Court Cases**

*A.G. v. Northbrook Indus., Inc.*,

    No. 1:20-CV-5231 (N.D. Ga. June 14, 2024) ..................................v

*Doe (K.B.) v. G6 Hosp., LLC*,

    No. 1:23-CV-2597, 2023 WL 8650785 (N.D. Ga. Dec. 14, 2023) ................v

*Doe (L.M.) v. 42 Hotel Raleigh, LLC*,

    717 F.Supp.3d 464 (E.D.N.C. 2024) ............................................iv

*Doe (L.M.) v. 42 Hotel Raleigh, LLC*,

    No. 5:23-CV-235, 2024 WL 4204906 (E.D.N.C. Sept. 16, 2024).......... ii, 34

*Does 1-4 v. Red Roof Inns, Inc.*,

    688 F.Supp.3d 1247 (N.D. Ga. 2023)............................................v

*G.W. Northbrook Indus.*,

    No. 1:20-CV-5232, 2022 WL 1644923 (N.D. Ga. May 24, 2022) ................v

*I.R. v. I Shri Khodiyar, LLC*,

    723 F.Supp.3d 1327 (N.D. Ga. 2024)............................................v

*J.G. v. Northbrook Indus.*,

    No. 1:20-CV-5233, 2022 WL 4482735 (N.D. Ga. Aug. 2, 2022) ................v

*M.A. v. Wyndham Hotels & Resorts, Inc.*,

425 F. Supp. 3d 959 (S.D. Ohio 2019) ......................................................... 29

*S.Y. v. Naples Hotel Co.*,

476 F. Supp. 3d 1251 (M.D. Fla. 2020) ...................................................... 29

*United States v. Chappell*,

No. 1:10-CR-00531 (N.D. Ga. Nov. 29, 2010) ............................................ 13

*W.K. v. Red Roof Inns, Inc.*,

692 F.Supp.3d 1366 (N.D. Ga. 2023) ........................................................... v

**Federal Statutes**

18 U.S.C. § 1591 (e)(4) .................................................................. 22, 23, 25

18 U.S.C. § 1591 (a)(2) ............................................................................. 23

18 U.S.C. § 1595 (a) ..................................................... i, xi, 1, 2, 20, 22

28 U.S.C. § 1291 ....................................................................................... xi

28 U.S.C. § 1331 ....................................................................................... xi

## <u>Statement of Jurisdiction</u>

This Court has subject-matter and appellate jurisdiction to decide Appellant-Plaintiff C.B.'s appeal from the district court's order granting Appellee-Defendant Naseeb Investments, Inc.'s motion for summary judgment and entry of judgment in Naseeb's favor. *See* R-164 (MSJ Order) at 50; R-165 (Judgment) at 1.

The Court has subject-matter jurisdiction because C.B. asserts claims against Naseeb under the Trafficking Victims Protection Reauthorization Act (TVPRA), which is a federal statute. *See* R-13 at 21-24 (Am. Compl. ¶¶ 91-110) (asserting two civil-beneficiary claims); 18 U.S.C. § 1595 (a). Thus, the Court has subject-matter jurisdiction under the federal-question doctrine. *See* 28 U.S.C. § 1331.

The Court has appellate jurisdiction because the district court's order granting Naseeb's motion for summary judgment and entry of judgment in Naseeb's favor decided all claims by all parties. *See* R-164 at 50; R-165 at 1. The district court entered its order on September 12, 2024, the clerk entered judgment in Naseeb's favor on September 13, 2024, and C.B. filed her notice of appeal on October 10, 2024—clearly within the thirty-day deadline for a timely notice of appeal. *See* R-168 (C.B.'s Not. of Appeal) at 2. Thus, the Court has appellate jurisdiction under the final-judgment doctrine. *See* 28 U.S.C. § 1291.

**Statement of Issues**

This appeal presents the two questions regarding whether Appellant-Plaintiff C.B. satisfied the elements of a civil-beneficiary claim under the Trafficking Victims Protection Reauthorization Act (TVPRA), *see* 18 U.S.C. § 1595 (a), against Appellee-Defendant Naseeb Investments, Inc., a hotel operator.

(1)    Where the evidence is that, for at least six weeks, Naseeb rented hotel rooms to C.B.'s trafficker, Timothy Chappell, Naseeb assigned all sex offenders, including Chappell, to the same area of its hotel, Naseeb directed its housekeepers to enter the rooms of sex offenders and prostitutes only once a week, and Naseeb's staff didn't report prostitution to the police but only within Naseeb, <u>has C.B. satisfied the second element (Naseeb's participation in a venture)?</u>

(2)    Where the evidence is that Naseeb knew that Chappell was a sex offender on probation, Naseeb knew that Chappell rented a second room on a nightly basis and told housekeeping not to clean that second room, one of Naseeb's housekeepers saw C.B. outside of that second room with a John, another John had such loud sex with C.B. in that second room that it could be heard in other rooms, and C.B.'s presence with Chappell on Naseeb's premises was so suspicious that another guest called that second room to see if C.B. was okay, <u>has C.B. satisfied the fourth element (Naseeb's actual or constructive knowledge that the venture engaged in an act violating the TVPRA)?</u>

The answer to each question is yes. And because C.B. has satisfied the elements of a civil-beneficiary claim under the TVPRA, this Court should reverse the district court's summary judgment in favor of Naseeb.

## Statement of Case

This appeal arises from a civil action by Appellant-Plaintiff C.B. against Appellee-Defendant Naseeb Investments, Inc. *See* R-13 at 3 (Am. Compl. ¶¶ 1-4).[3]

As the district court explains, "[t]his case is one of a growing number of lawsuits in this district – and across the nation – involving claims that arise from sex trafficking at a hotel." R-164 (MSJ Order) at 1. "Similar to other plaintiffs in these cases, [C.B.] raises claims under 18 U.S.C. § 1595(a), which is sometimes referred to as the civil beneficiary provision of the Trafficking Victims Protection Reauthorization Act ('TVPRA')." *Id.* C.B. asserts civil-beneficiary claims against "Naseeb Investments, Inc. ('Naseeb'), which owns, operates, and manages the Hilltop Inn in Conley, Georgia." *Id.* "She contends [Naseeb] benefited from child sex trafficking crimes against her when her trafficker coercively held her and sold her for commercial sex acts on [Naseeb's] property in June 2010, when she was fifteen years old." *Id.* "This is clearly a dreadful case where a young teenage girl was manipulated and seriously sexually exploited and abused." *Id.* at 50.

---

[3] In this brief and any other briefs that we file on behalf of C.B., we'll generally cite to the district-court record as R-[doc. no.] at [page no. generated by the district court's e-filing system]. *See* 11th Cir. R. 28-5. Thus, "R-13 at 3" means Document 13 on the district-court docket at CM/ECF Page 3.

After discovery, the district court "reluctantly conclude[d] that it must grant [Naseeb's] Motion for Summary Judgment." *Id.* at 3. It found that C.B. hadn't satisfied the second element (Naseeb's participation in a venture) and the fourth element (Naseeb's actual or constructive knowledge that the venture engaged in an act violating the TVPRA) of a civil-beneficiary claim. *Id.*

1.    **Statement of Prior Proceedings**

On October 13, 2020, C.B. filed a complaint in the U.S. District Court for the Northern District of Georgia against Naseeb. *See* R-1 (Compl.). In her complaint, C.B. asserted civil-beneficiary claims under the TVPRA against Naseeb. *See id.* at 13 (¶ 65). On the same day, C.B. also filed a motion for leave to proceed using only her initials in public filings, while confidentially disclosing her full name to Naseeb. *See* R-4 (Mot.). On October 19, 2020, the district court granted C.B. permission to proceed, subject to the district court revisiting the issue before trial. *See* Oct. 19, 2020 Order, By Docket Entry Only.

On November 17, 2020, Naseeb filed an answer to C.B.'s complaint and a motion for judgment on the pleadings. *See* R-10 (Ans.); R-11 (Mot.); R-11-1 (Br.). On November 30, 2020, C.B. filed an amended complaint and a response to Naseeb's motion. *See* R-13 (Am. Compl.); R-15 (Resp.). In her amended complaint, C.B. again asserted civil-beneficiary claims under the TVPRA against Naseeb, though this time more clearly alleging two separate counts—one for sex

trafficking and another for labor trafficking—as well as other clarifying amend-
ments. *See* R-13 at 21-24 (¶¶ 91-110). In her response to Naseeb's motion, C.B.
argued that her amendments mooted Naseeb's motion. *See* R-15 at 1-3.

With Naseeb filing answers to C.B.'s complaints, the parties proceeded with
discovery, even while Naseeb's motion for judgment on the pleadings was still
pending. In any event, on July 2, 2021, the district court issued an order denying
Naseeb's motion for judgment on the pleadings as moot. *See* R-44 (Order). Over
the next year, the parties continued with discovery.

On August 16, 2022, Naseeb moved for summary judgment in its favor on
all C.B.'s claims. *See* R-116 (Mot.); R-116-01 (Br.). On September 6, 2022, C.B.
filed a response to Naseeb's motion. *See* R-120 (Resp.). On April 5, 2023, the dis-
trict court held a hearing on Naseeb's motion. *See* R-156 (Tr. of Oral Argument
Proceedings). On September 12, 2024, the district court granted Naseeb's motion
for summary judgment, and on September 13, 2024, the clerk entered judgment in
Naseeb's favor. *See* R-164 (Order); R-165 (Judgment).

On October 10, 2024, C.B. filed a notice of appeal from the district court's
order granting Naseeb's motion for summary judgment and the clerk's entry of
judgment in Naseeb's favor. *See* R-168 (Not.).

**2.     Statement of Facts**

    **A.     The Hilltop Inn and Naseeb's Management**

The Hilltop Inn is located at 3140 Moreland Avenue in Conley, Georgia, which is in the southeast part of the Atlanta metropolitan area. *See* R-121 (C.B.'s Resp. to Naseeb's Statement of Material Facts) at 2-3 (¶ 2); R-144 (Vic Amin Dep.) at 7; R-120-6 (Receipts from Chappell's Stay at Hilltop Inn).

The Hilltop Inn property has two adjoining buildings, which the district court referred to as "the 'Lower' and 'Upper' buildings." R-164 (Order). At all times relevant to C.B.'s claims, the entire property operated as the Hilltop Inn (or the "hotel"). *See* R-144 at 12. The Upper Building was later branded as an Econo-lodge, while the Lower Building retains the Hilltop Inn name. *See id.* at 11-12.

Naseeb has owned the Hilltop Inn property since 2006. *See* R-121 at 3 (¶ 3); R-144 at 6-8. Naseeb, in turn, is a corporation owned by Vic Amin, Nalini Amin (Vic's mother), Atul Patel, and George Patel (Atul's father). *See* R-144 at 7.

During the time relevant to C.B.'s claims—before and during June 2010— when the entire property operated as the Hilltop Inn, Vic Amin "oversaw the oper-ations" of the hotel. R-144 at 22; *see also* R-132 (Neemita Amin Dep.) at 15-16. Atul Patel and Neemita Amin (Vic's wife) assisted with the hotel's daily opera-tions. *See* R-144 at 22; R-132 at 19-21, 35-37 (describing her role).

The hotel's front desk was in the Upper Building. *See* R-144 at 12-13, 69. The property had about eight surveillance cameras in various areas, which could be viewed from the front desk. *See id.* at 13-17; R-120-13 (Naseeb's Resp. to C.B.'s

Interrog. 4) at 4-5; R-131 (Ricky Vaughn Dep.) at 79; R-132 at 34; R-133 (Johnny Johnson Dep.) at 34-35. Naseeb regularly placed an employee at the front desk to monitor the property. *See* R-144 at 46. Naseeb had its housekeeping and maintenance employees serve both buildings. *See id.* at 19. And during the time relevant to C.B.'s claims, Naseeb offered weekly rentals. *See id.* at 48.

### B.    Management's Denial of Sex Trafficking

According to Vic Amin, hotel employees were instructed to report signs of sex trafficking to management, but he says that no one reported any sex trafficking until this action was filed. *See id.* at 69-70. Mr. Amin also claimed he wasn't aware of any issues with crime, drugs, or prostitution on the property before this action. *See id.* at 63-68. When Mr. Amin was shown various police reports during his deposition, including a report of child molestation at the hotel in 2008, he said he didn't recall any of them. *See id.* Mr. Amin also didn't recall his hotel staff telling him that sex offenders were living on the property or that Timothy Chappell, C.B.'s trafficker, was a registered sex offender on probation. *See id.* at 65-68.

Naseeb couldn't identify any employees (other than Neemita Amin (Vic's wife) and Atul Patel (Vic's co-owner)) who could support Vic Amin's contentions that there was no reported crime, drugs, or prostitution on the property. *See* R-120-13 (Naseeb's Resp. to C.B.'s Interrog. 3) at 3-4; R-144 at 93.

### B.    Employee Reports of Rampant Sex Trafficking

While Naseeb couldn't identify any employees to support Vic Amin's denials, at least four of Naseeb's former employees located by C.B.'s counsel each tell "a wholly different story than that presented by Mr. Amin." R-164 at 6. "Each of the former employees witnesses prostitution and evidence of drug use regularly on the property during [Naseeb's] ownership, some before and some during the time period when [C.B.] was trafficked there." *Id.* "In addition, each former employee had personally witnessed or had been aware of one or more instances in which a minor was being sold for commercial sex on the property." *Id.*

These former employees consistently testified that "they received no training regarding identifying or reporting signs of sex trafficking." *Id.*; *see* R-133 (Johnson) at 33-34 ("[D]id you ever receive any training on how to recognize sex trafficking? A: No."); R-131 (Vaughn) at 65-66 ("[D]id you ever receive any human trafficking related training? .... A: No."); R-134 (Joan Blackmon Dep.) at 62 ("Did you ever receive any training while you were working for Vic at the property? A: No."); R-137 (Pauline Madete Dep.) at 91 ("[D]id you ever receive any kind of training on sex trafficking prevention? A: No.").

### i. Ricky Vaughn

Ricky Vaughn worked at the Hilltop Inn between 2000 and 2015. *See* R-131 at 6-7. Mr. Vaughn did maintenance, cleaned rooms, and did security at the hotel at various times— "[e]verything except working at the front desk." *Id.* at 7.

Mr. Vaughn was aware of prostitution and drug use on the property and informed Mr. Amin of it. *See id.* at 18-20, 22-23. He was aware of a pimp who would "drop off [] girls" at the hotel and leave. *Id.* at 24. He also knew of a specific incident in "[200]8," in which a missing underage girl, whose family had come to the hotel searching for her, was later found at the hotel. *Id.* at 26-28. At the time her family came to the hotel, she could not be located. *Id.* But, later, Mr. Vaughn went into a room to do maintenance and saw the underage girl there, engaging in activity he believed to be consistent with selling commercial sex. *Id.* After being called back to the hotel by Johnny Johnson, a front desk clerk, the girl's family came to the hotel and took her home. *Id.*

Mr. Vaughn also knew of two additional instances where he thought "there might be girls who were under 18 ... selling sex at the property." *Id.* at 28-29.

According to Mr. Vaughn, Mr. Amin told the staff that they should keep an eye on the sex offenders, and Mr. Johnson proposed putting all the sex offenders in one place to make monitoring easier. *Id.* at 41-42.

### ii. Johnny Johnson

Johnny Johnson is a former front desk clerk at the Hilltop Inn who worked there between 2005 and 2008, and at times lived on the property. *See* R-133 at 45-46. Mr. Johnson saw drug deals occurring on the security cameras. *Id.* at 78. He also observed significant prostitution activity. *Id.* at 13-16, 19, 42. Mr. Johnson es-

timated that, during the time he worked the front desk, "more than" once a month he was personally propositioned for commercial sex by women he knew to be sex workers who were trying to avoid being kicked out of the hotel. *Id.* at 55-60. Whenever Mr. Johnson became aware of prostitution or drug deals on the property, he would note it and inform Mr. Amin instead of calling the police. *Id.* at 78.

Mr. Johnson was aware of two police raids in which male pimps were arrested at the Hilltop. *See id.* at 15-16, 67-69. He informed Mr. Amin about police raids at the property. *Id.* Mr. Johnson also heard reports from other employees that some of the people selling commercial sex at the hotel were underage. *Id.* at 19-20.

Mr. Johnson was also aware of the same incident as Mr. Vaughn, which involved the missing underage girl engaged in commercial sex who was found at the hotel. While Mr. Johnson was working the front desk, the family of the missing underage girl came to the property searching for her. *Id.* at 19-22. Mr. Johnson learned that the girl was later found by another employee, likely Mr. Vaughn, in a room "in the bed, naked, high, and there was a bunch of guys in the room with her." *Id.* at 19-22, 73-75. After Mr. Johnson learned about the girl's presence at the hotel, he called the girl's family to return to the hotel. *Id.* at 20-22, 73-75.

And Mr. Johnson was also aware of a different minor girl whose mother had been working as a prostitute on the property and who he learned "was basically following ... her mother's footsteps." *Id.* at 22, 75-77. He tried to remove the minor

girl from the property, but she kept returning. *Id.* Mr. Johnson told Mr. Amin about these incidents. *Id.* at 23, 75-78.

Mr. Johnson also showed Mr. Amin a DeKalb County website indicating that there were multiple registered sex offenders living on the property. *See id.* at 29-30. Mr. Johnson and the staff knew which residents were sex offenders because a probation officer had previously come to the property and given the staff a list of the registered sex offenders living on site. *See id.* at 30-31. The probation officer would come to the property about twice a month and on holidays to check on the sex offenders. *See id.* at 31. When the probation officer came to the property, the officer would check in at the front desk and question the staff about the sex offenders, ask if Mr. Johnson had seen them with any kids or engaged in any suspicious activity, and then go to their rooms. *See id.* at 31-32. Mr. Johnson said that Mr. Amin was aware of this procedure by the probation officer. *See id.*

When Mr. Johnson worked the front desk, he would place all the sex offenders on the same floor and put all the prostitutes in another area. *See id.* at 32, 35-36.

### iii.    Joan Blackmon

Joan Blackmon worked as a housekeeper at the Hilltop until 2009 and lived on the property for around three years during the time she worked there. She personally witnessed prostitution and drug deals occurring on the property. *See* R-134 at 9-10, 14, 20-21, 34. In her experience, when Vic Amin took over, criminal activ-

ity on the property increased. *See id.* at 29-30.

Ms. Blackmon spoke to Mr. Amin about these issues involving prostitution, drugs, and crime. *See id.* at 26-27. She specifically expressed concern to Mr. Amin that the prostitutes were "tearing up these rooms" and asked him, "Why do you keep renting 'em to 'em?" *Id.* at 22.

Mr. Amin responded that, "**We need the money. We need the money**." *Id.* (emphasis added). Mr. Amin told Ms. Blackmon that prostitution was "bringing the money" to the hotel, and "[t]he only way you going to make some money, **you got to get these girls back up here working**." *Id.* at 47 (emphasis added).

"Vic [Amin] [also] told [Ms. Blackmon] to only clean the sex offenders' hotel rooms and the known prostitutes' hotel rooms only once a week." *Id.* at 57. Meanwhile, Mr. Amin was aware that there would be customers that rented and "use[d] the room for 15 or 10 minutes," housekeepers like Ms. Blackmon would "go clean the room," and "then the[] [hotel] [would] rent it again." *Id.* at 48-49.

According to Ms. Blackmon, Mr. Amin was aware of a prior employee, "Mario," who years earlier was living at the Hilltop Inn with one or two underage girls whom he was selling for sex. *Id.* at 13-19, 58-61. Mr. Amin made Mario move out only after another employee advised Mr. Amin that Mario would get them in trouble by having "young girls up there [being sold for] sex." *Id.*

Mr. Amin was also aware that sex offenders were living on the property, and

in fact, Ms. Blackmon learned about that fact *from* Mr. Amin. *See id.* at 44-45 ("Q: How were you made aware of sex offenders living at the property? A: Because that [sic] what Vic told me, living right here on the second floor.").

### C.    Solomon Mustafa Trafficking Incidents

In addition to the many instances of sex trafficking observed and reported by Mr. Vaughn, Mr. Johnson, and Ms. Blackmon, a trafficker named Solomon Mustafa (along with another co-defendant) was convicted for trafficking three women for sex at the Hilltop Inn and other hotels between March and May of 2010, just shortly before Chappell trafficked C.B. at the Hilltop Inn.

"[T]he transcripts from Mustafa's criminal trial" "show that 'Mustafa beat, raped, [and] drugged' one of his victims in a room at the Hilltop Inn, 'then duct taped her, put sheets over her head, walked her through [the] common area (where there are cameras) and stuffed her in the back of his car.'" R-164 at 13; *see* R-120-15 (Mustafa Trial Tr.); *United States v. Mustafa*, No. 1:11-CR-234, Doc. 170 at 65-66 (Mustafa Trial Tr.). "Mustafa also sold two other women for commercial sex at the Hilltop Inn during the same period." R-164 at 13; *see* R-120-15 at 12-15.

"The severity of the events occurring in late May and early June 2010 depicted in the *Mustafa* transcript are a noteworthy flag that sex trafficking was apparently accepted as business as usual at Hilltop." R-164 at 14. These events occurred "only three or four weeks at most before C.B.'s sexual entrapment at [the]

Hilltop [Inn] on June 21, 2010." *Id.*

### D.  Timothy Chappell and Trafficking of C.B.

#### i.  Chappell begins living at the Hilltop Inn.

On May 10, 2010, Timothy Chappell checked in to the Hilltop Inn and paid with cash at a weekly rate of $205. *See* R-120-6; R-144 at 82-83. Chappell was a registered sex offender who had been released from prison several days earlier; he was treating the hotel room as his residence while he was on probation. *See* R-120-7 (Ga. DOC Dep.) at 2; R-120-8 (Probation Notes) at 30-31, 35. Chappell was a white male and forty-eight years old at the time. *See United States v. Chappell*, No. 1:10-CR-00531, Doc. 1 (N.D. Ga. Nov. 29, 2010).

Chappell initially stayed in Room 126, but around June 4, 2010, he was moved to Room 254. *See* R-120-8 at 15-16; R-120-6 at 2. Room 126 was in the Upper Building, while Room 254 was in the Lower Building—where other sex offenders were regularly placed. *See* R-144 at 78, 82-83; R-131 at 41-42; R-134 at 51. On June 4, 2010, a probation officer called the Hilltop Inn front desk to verify Chappell's change of room. *See* R-120-8 at 15. Chappell stayed in Room 254 until he left the property around June 23, 2010. *See* R-120-6; R-144 at 87-88.

#### ii.  Chappell meets 15-year-old C.B. through the internet.

At some point while Chappell was staying at the Hilltop Inn, he posted an advertisement on Craigslist for a free room for rent for a female. *See* R-121 at 3-4

(¶ 5). C.B., a black girl who had just turned fifteen years old, responded to the ad and started communicating with a man she understood was named "Steve," but who almost certainly was Chappell pretending to be someone else. *Id.* at 4 (¶ 6).

C.B. was living with her aunt at the time, and she wanted to drop out of school and run away. *See* R-123 (C.B. Dep.) at 18, 23, 25. C.B. first told Steve that she was older, but within a few days, Steve knew C.B.'s real age. *See* R-121 at 4 (¶ 7); R-123 at 24. Steve wasn't concerned with C.B.'s age, and they discussed a plan for C.B. to live with Steve in his apartment. *See* R-123 at 25-28. Steve sent C.B. a photo, and she thought that he was a white man in his mid-to-late twenties. *Id.*

Steve later introduced C.B. to Chappell, whom Steve called his "brother Tim." R-121 at 4 (¶¶ 8-9); R-123 at 30-31. C.B. believed that Chappell was in his early-to-mid thirties. *See* R-123 at 32, 35. C.B. started talking to Chappell every day, and they discussed a plan for C.B. to move in with Chappell instead of Steve because Steve was going to be "away and busy." *Id.* at 31, 35-37. Chappell knew that C.B. was 15 years old. *See* R-121 at 5 (¶ 10); R-123 at 32-33.

### iii.    Chappell rents a second room at the Hilltop Inn for C.B.

On June 21, 2020, while he was staying in Room 254, Chappell paid Naseeb for a second room, Room 252, which was right next door and had a single bed. *See* R-120-6 at 3. Instead of weekly, Chappell paid $44.99 nightly for Room 252. *See* R-144 at 88-90; R-120-6 at 3. Chappell told C.B. that he told housekeeping that

they didn't need to clean Room 252, and housekeeping never tried to enter Room 252 during the time C.B. was there. *See* R-123 at 72.

During the evening of June 21, 2020, Chappell arranged for someone to pick up C.B. from her aunt's house and take her to the Hilltop Inn. *See* R-121 at 5 (¶¶ 11-12); R-123 at 44-45. C.B. believed that she was going to Chappell's apartment—not a hotel—and C.B. didn't think that she would be having any sort of a sexual relationship with Chappell. *See* R-121 at 5-6 (¶ 13); R-123 at 36-39. C.B. thought Chappell was a nice guy and just wanted to help her. *See* R-123 at 41.

When C.B. arrived at the Hilltop that evening, she was surprised by the fact that it was a hotel, not an apartment, and that Chappell was much older than she'd expected and didn't look like how he described himself. *See id.* at 49. Chappell paid the driver and spoke with him for a few minutes, while C.B. stood with Chappell in the hotel parking lot. *See* R-121 at 7, 14-15 (¶¶ 17, 33); R-123 at 49.

After the driver left, C.B. went with Chappell up the stairs into his hotel room, Room 254. *See* R-123 at 50. As C.B. walked up the stairs with Chappell, they passed two men talking who stared at C.B. as she passed. *See* R-121 at 7-8 (¶ 17); R-123 at 51. When C.B. reached Chappell's room (Room 254), Chappell explained to her that he had gotten her a room next door (Room 252). R-123 at 52-53. They spent thirty minutes in Chappell's room before he took C.B. to her room next door. *Id.* Chappell then returned to his room. *Id.* at 53.

### iv. **Chappell sells sex with C.B. to three other men, and Chappell himself rapes C.B.**

When C.B. entered her room, Chappell immediately called her and told her that someone was coming to her room, that Chappell needed money to pay for the room, and that C.B. had to have sex with the man coming to her room. *See id.* at 53-56. C.B. was scared and didn't feel like she could say no. *See id.* at 54.

Soon after, a John #1 arrived, bought sex with C.B. from Chappell, and then sexually assaulted C.B. *See* R-121 at 9-10 (¶ 23); R-123 at 55-57. Once John #1 was gone, Chappell called C.B. *See* R-123 at 57. Chappell "heard noises, so it made him upset." *Id.* C.B. went to sleep crying. *Id.* at 60.

The next day, June 22, 2010, likely before 11:00 AM, Chappell paid Naseeb to rent Room 254 for an additional day. *See* R-144 at 30; R-120-6 at 3. That same morning, Chappell called C.B. to tell her that another man would be coming to her room. *See* R-123 at 60. At some point, Chappell also told C.B. that he'd been posting photos of C.B. online and advertising her for commercial sex. *See* R-121 at 10-11 (¶ 25); R-123 at 58-59. And Chappell even came into C.B.'s room himself and he forcibly raped her. *See* R-121 at 10 (¶ 24); R-123 at 61-62.

Eventually, John #2 arrived and went into C.B.'s room, but he left because he was concerned C.B. was underage. *See* R-121 at 11 (¶ 26); R-123 at 63.

A John #3 later came to C.B.'s room. *See* R-121 at 11-12, 16 (¶¶ 26, 35); R-123 at 63. When John #3 arrived, he asked C.B. to hold the door open so that he

could search the room. *See* R-121 at 14-16 (¶¶ 33-35); R-123 at 71-72.

While C.B. was holding the door open for John #3, C.B. "saw a housekeeper." R-123 at 72. C.B. saw "an older, foreign lady standing there with a housekeeping cart," and she "made eye contact with [C.B.]" for "a few seconds," "but she didn't say anything." R-123 at 72-73; *see* R-121 at 14-16 (¶¶ 33-35).

Once John #3 was inside the room, C.B. asked him for help taking her home. *See* R-123 at 63-64. John #3 said he couldn't help her then, and he instead bought and had commercial sex with C.B. *See id.* at 62-64.

As the day continued, a John #4 came to C.B.'s room. *Id.* at 66-67. John #4 also bought and had commercial sex with C.B. *See id.* For the second time in a roughly 24-hour period, the John, who was "tall, kind of bigger," "got loud" with C.B. *See id.* He also tried to force C.B. to drink liquor. *See id.*

Meanwhile, at some point during this day when Johns #2-4 came to C.B.'s room to buy commercial sex with C.B. from Chappell, "[s]omeone had called [C.B.'s room] ... and asked was [she] okay." R-123 at 69. They also asked if C.B. was "with a white man"—*i.e.*, they asked an obvious question: Why was C.B., a 15-year-old black girl, with Chappell, a 48-year-old white man at the Hilltop Inn? Scared, C.B. told them that she wasn't with Chappell and she was "okay." *Id.* C.B. then "told Chappell that someone had called the room asking questions." *Id.*

Meanwhile, and again on this same day when Johns #2-4 came to C.B.'s

room to buy commercial sex with her, Chappell received two face-to-face visits to his room at the Hilltop Inn from his probation officer and from DeKalb County police. *See* R-120-8 at 13-14. During these visits, officers searched Chappell's room and discovered pornographic material, including of suspected minors. *See id.* at 14.

### v. C.B. escapes Chappell and the Hilltop Inn.

After C.B. made repeated calls to him, John #3 eventually returned to the Hilltop Inn the night of June 22, 2010, and drove C.B. back to where her aunt lived. *See* R-121 at 13 (¶ 28); R-123 at 73-74. C.B. escaped Chappell and the Hilltop Inn—but only after Chappell raped her and three of four Johns paid for and bought commercial sex with C.B. from Chappell. Chappell was later arrested and pled guilty to trafficking C.B. *See* R-120-10 (Chappell's Guilty Plea).

### 3. Statement of Standard of Review

The Court reviews "[the] district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences" in favor of C.B., as the non-movant, and against Naseeb, as the movant. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [the judge] is ruling on a motion for summary judgment or for a directed verdict.'" *Id.*

## Summary of Argument

The district court erred in finding that C.B. hadn't satisfied the second and fourth elements of a civil-beneficiary claim under the TVPRA.

*First*, C.B. satisfied the second element—Naseeb's participation in *a venture* with C.B.'s trafficker, Timothy Chappell. Naseeb's room rentals to Chappell for six weeks, by itself, satisfies the participation element. Nothing more than room rentals is required to show Naseeb's participation in a venture with Chappell.

Even if more were required, Naseeb directly assisted Chappell in other ways—by assigning all sex offenders, including Chappell, to the same area of its hotel; by directing its housekeepers to enter the rooms of sex offenders and prostitutes only once a week; and by not reporting prostitution to the police but only within Naseeb. These practices assisted Chappell by helping him, and those buying commercial sex with C.B., to avoid detection.

*Second*, C.B. satisfied the fourth element—Naseeb's knowledge that its venture with Chappell engaged in *an act* violating the TVPRA. Naseeb should've known Chappell was engaged in trafficking because Naseeb knew that Chappell was a sex offender on probation, knew that he rented a second room on a nightly basis and told housekeeping not to clean that second room, and knew that trafficking was rampant at the Hilltop Inn. Nothing more was required to show Naseeb should've known that its venture engaged in *an act* violating the TVPRA.

Moreover, even if specific knowledge were required, Naseeb also should've known that Chappell was specifically trafficking C.B. In addition to the fact that Naseeb should've known that Chappell was engaged in trafficking at the Hilltop Inn, one of Naseeb's housekeepers saw C.B. outside of Chappell's second room with a John, another John had such loud sex with C.B. in that second room that it could be heard in other rooms, and C.B.'s presence with Chappell on Naseeb's premises was so suspicious that another guest called that second room to see if C.B. was okay. From that evidence, a jury could find that Naseeb should've known that Chappell was specifically trafficking C.B.

## **Argument & Citations of Authority**

The civil-remedy provision of the TVPRA provides that:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595 (a) (2023).

Here, C.B. doesn't assert that she's a victim of TVPRA violations perpetrated by Naseeb. Rather, C.B. asserts that she's a victim of TVPRA violations perpetrated by Chappell, while Naseeb knowingly *benefitted* from its participation in a venture with Chappell and Naseeb knew or should've known that the venture with

Chappell had engaged in an act violating the TVPRA. This type of claim, thus, is often called a "beneficiary" claim—as opposed to a perpetrator claim. R-164 at 1.

In *Red Roof*, this Court identified four elements that a plaintiff must satisfy to establish a civil-beneficiary claim against a defendant:

> [A] plaintiff must plausibly allege that the defendant (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021); *but see G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023) (describing the four elements of a civil-beneficiary claim differently and in a different order).

In this action, the district court found that Naseeb only genuinely contests the second element (Naseeb's participation in a venture) and the fourth element (Naseeb's actual or constructive knowledge that the venture engaged in an act violating the TVPRA) of a civil-beneficiary claim. *See* R-164 at 25 ("[T]hough, the Court briefly discusses elements one and three – neither is seriously contested."); *id.* at 26 ("[Naseeb] concedes that this [first] element is satisfied, and the Court agrees."); *id.* at 28 ("[T]here is no question that if all of the other elements were met, this [third] element would be no obstacle.").

As such, we'll limit our argument in this brief to those two elements—participation and knowledge—that the district court found weren't satisfied. As to

each, the district court erred in stating the legal requirements and then how it applied those requirements to the evidence C.B. presented. In other words, the district court incorrectly required C.B. to present more evidence than the law requires as to participation and knowledge. But, even if the district court's statement of the law were correct, C.B. still would've satisfied those requirements as well.

1. **C.B. satisfied the second element—Naseeb's participation in <u>a venture</u> with C.B.'s trafficker, Chappell.**

   A. **The phrase "participation in a venture" must be given its plain meaning.**

In *Red Roof*, "[m]ost of the parties' dispute concern[ed] the second element—to knowingly benefit *from participating in a venture*." 21 F.4th at 724. "The franchisors argue[d], and the district court held, that we should incorporate the definition of 'participation in a venture' from the criminal provisions in Section 1591." *Id.* Those provisions say that, as used "[i]n this section [*i.e.*, Section 1591]," "[t]he term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C. § 1591 (e)(4).

"Instead of incorporating Section 1591(e)(4)'s idiosyncratic definition of 'participation in a venture,' [this Court] interpret[ed] that phrase in Section 1595(a) according to its plain meaning." 21 F.4th at 724. "The ordinary meaning of 'venture' is an undertaking or enterprise involving risk and potential profit." *Id.* (citing Black's Law Dictionary (11th ed. 2019); Oxford English Dictionary 520 (2d ed.

1989)). "The ordinary meaning of participate or participation is to take part in or share with others in common or in an association." *Id.* at 724-25 (citing Black's Law Dictionary (11th ed. 2019); Oxford English Dictionary 268 (2d ed. 1989)).

If this Court had accepted the franchisors' argument in *Red Roof*, it would've eliminated the distinction between civil-perpetrator liability and civil-beneficiary liability—the whole point of Congress's 2008 amendment of the TVPRA, which added civil-beneficiary liability. If a plaintiff can show that the defendant knowingly assisted, supported, or facilitated a TVPRA violation, as required by Section 1591 (e)(4), then the defendant would be a *perpetrator* itself. *See* 18 U.S.C. § 1591 (a)(2). The civil-beneficiary provision only has meaning if participation requires something *less* than participating in the TVPRA violation itself. The civil-beneficiary provision requires only that the defendant participate in *a venture* with the perpetrator—not participate in the TVPRA violation itself.

"Accordingly, [this Court] conclude[d] that the phrase 'participation in a venture' requires that [a plaintiff] allege that the [beneficiary] took part in a common undertaking or enterprise involving risk and potential profit." *Red Roof*, 21 F.4th at 725. This language—took part in a common undertaking or enterprise involving risk and profit—is *Red Roof*'s holding and the only test for participation.

## B. Naseeb's room rentals to Chappell for six weeks satisfy the participation element.

Here, C.B. satisfied *Red Roof*'s plain-meaning interpretation of participation.

C.B. presented evidence that, in exchange for weekly payments of $205 for at least six weeks, Naseeb rented Chappell a room for himself—first Room 126 and then Room 254. *See, e.g.*, *See* R-120-6 at 2; R-120-8 at 15-16; R-144 at 82-83. And, in exchange for two one-day payments of $44.99 for at least two days, Naseeb rented Chappell a room he used to sell sex with C.B.—Room 252. *See* R-120-6 at 3.

By itself, Naseeb's room rentals to Chappell—one room on a weekly basis for at least six weeks and another room for two nights—satisfy the participation element. Naseeb's room rentals were a common undertaking with Chappell involving *risk* because, among other things, Chappell could've damaged Naseeb's rooms, just as other renters and traffickers had done. *See, e.g.*, R-134 at 22 ("[T]hese girls ain't doing nothing but tearing up these rooms, tricking and tearing up the rooms. .... They tear up this room, they move to the next room. They tear up that room, they move to the next room."). And they were a common undertaking with Chappell involving *profit* because of the rent money alone, but also because of the potential for prostitution. *See, e.g.*, *id.* at 47 ("The only way you going to make some money, you got to get these girls back up here working.").

In sum, Naseeb participated in "a venture with Chappell to rent [him] hotel rooms," and that's a common undertaking with risk and profit. R-13 at 22 (¶ 95).

### C.  Nothing more than room rentals is required to show Naseeb's participation in a venture with Chappell.

Even though Naseeb's room rentals to Chappell plainly constitute a venture

involving risk (*e.g.*, damage to the rooms) and profit (*e.g.*, rent money), the district court held that wasn't enough. It held that "there is not evidence presented here that would support a finding that [Naseeb] took any action to support or facilitate Chappell's specific [trafficking] activities." R-164 at 40. In the next subsection, we'll show why that's factually incorrect; Naseeb did support and facilitate Chappell's trafficking activities. But, for now, that's not legally required.

Compare what the district court held is required for a *civil*-beneficiary claim with what Section 1591 (e)(4) requires for a criminal violation. The district court required evidence "to **support or facilitate** Chappell's specific [trafficking] activities." *Id.* (emphasis added). That's nearly identical to the Section 1591 (e)(4)'s definition that "[t]he term 'participation in a venture' means knowingly **assisting, supporting, or facilitating** a violation of subsection (a)(1) [a violation of the TVPRA]." 18 U.S.C. § 1591 (e)(4) (emphasis added).

Of course, that can't be the correct requirement to apply to civil-beneficiary claims because *Red Roof*'s holding *rejected* "incorporating Section 1591(e)(4)'s idiosyncratic definition of 'participation in a venture.'" 21 F.4th at 724. Moreover, if a plaintiff had to show evidence that the defendant supported and facilitated specific trafficking activities, then the defendant would be a *perpetrator* and there'd be no point to civil-beneficiary liability.

To be sure, in *Red Roof*, this Court held that the Does in that case hadn't

plausibly alleged participation in a venture. But there are two key distinctions be-tween the facts here and the facts in *Red Roof.*

*First*, as the district court itself recognized, "[C.B.'s] definition of the ven-ture differs from that provided by plaintiffs in *Red Roof*, where plaintiffs defined the venture as a 'sex trafficking venture.'" R-164 at 36 n.28; *see Red Roof*, 21 F.4th at 727 ("The Does chose to frame the ventures at issue as sex trafficking ven-tures in their amended complaints. Yet they have provided no plausible allegations that the franchisors took part in the common undertaking **of sex trafficking**.") (emphasis added). Here, in stark contrast, C.B. alleges and argues that Naseeb par-ticipated in "a venture with Chappell to rent [him] hotel rooms." R-13 at 22 (¶ 95). That rental of hotel rooms, by itself, is a venture, regardless of whether they also had a common undertaking of sex trafficking.

Faced the type of venture allegations C.B. makes here, courts have held that a plaintiff can satisfy the participation element without direct participation with a sex-trafficking venture. Indeed, "[n]early every court agrees," and even "as the Eleventh Circuit has acknowledged," "the alleged venture can be a 'commercial venture []' like running or expanding a business." *Salesforce.com*, 76 F.4th at 554. "While a 'venture' can certainly run the gamut from an isolated act of sex traffick-ing to an international sex-trafficking enterprise, it can also be a business whose primary focus is not on sex trafficking." *Id.* After all, "[t]he text of Section 1595

does not say 'sex-trafficking venture,' but only 'venture.'" *Id.* at 553-54.

*Second*, the Does' claims decided on appeal were claims against the *franchisors*—not the hotel operators. *See, e.g.*, 21 F.4th at 727 ("[The Does] have provided no plausible allegations that the **franchisors** took part in the common undertaking of sex trafficking.") (emphasis added). The franchisors didn't rent the rooms to the sex traffickers. They just received a percentage of revenue *from the franchisees*. The franchisors never interacted or assisted the traffickers themselves. *See, e.g.*, *id.* at 726-27 ("These allegations may suggest that the franchisors financially benefited from renting hotel rooms to the Does' sex traffickers. But they do nothing to show that the franchisors participated in a common undertaking ....").

By contrast, in this action, C.B. asserts a claim against Naseeb—the hotel owner, operator, and manager that directly rented rooms to Chappell. Without the hotel rooms that Naseeb provided, Chappell couldn't have trafficked C.B. for sex at the Hilltop Inn. Naseeb took part in the venture by directly renting the rooms.

Were there any doubt that a motel operator participates in a venture by directly renting rooms to a sex trafficker, *Red Roof* itself extinguishes that doubt. This Court confirmed its agreement with a First Circuit case, *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017), that "renting a room to the abuser" is one of the "kinds of allegations [that] would establish a hotel operator's participation in a venture with a sex trafficker." 21 F.4th at 725-26.

As this Court explained in full:

> As for our sister circuits, only the First Circuit has addressed a Section 1595(a) beneficiary claim. *See Ricchio v. McLean*, 853 F.3d 553, 556-58 (1st Cir. 2017). And we think our reasoning is consistent with the disposition there. In *Ricchio*, the plaintiff sued the owner and live-in operators of a hotel where she was held hostage and sexually abused. *Id.* at 556. The First Circuit held that the plaintiff had plausibly alleged that the operators' association with the plaintiff's sex trafficker was a "venture" because her abuser "had prior commercial dealings with the [operators], which the parties wished to reinstate for profit." *Id.* at 555. Considering these dealings, the plaintiff also plausibly alleged that, **by renting a room to the abuser, the operators were "associating with him in an effort to force [the plaintiff] to serve their business objective."** *Id.* **We agree that these kinds of allegations would establish a hotel operator's participation in a venture with a sex trafficker**.

*Id.* (emphasis added).

If this Court's majority opinion were somehow not enough, Judge Jordan's concurring opinion reinforced, once more, that "our opinion addresses the plaintiffs' TVPRA 'beneficiary' claims against franchisors which do not operate or manage the hotels at which sex trafficking allegedly occurred." *Id.* at 729. "But, as the court explains, similar claims against those who own, operate, or manage the hotels in question (e.g., franchisees) would withstand a Rule 12(b)(6) motion to dismiss." *Id.* at 729-30. "[T]he participation element of a 'beneficiary' claim ... does not require that the defendant in question have participated in the sex trafficking act itself." *Id.* at 730. "'[P]articipation in a venture' requires only that a defendant take part in a common undertaking or enterprise ...." *Id.*

And other courts—including one cited by Judge Jordan in *Red Roof*—have held that allegations of a hotel operator directly renting rooms to a trafficker satisfy the participation element. *See, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019) ("This Court finds Plaintiff has alleged sufficient facts to show Defendants 'participated in a venture' under § 1595 by alleging that **<u>Defendants rented rooms</u>** to people it knew or should have known [were] engaged in sex trafficking. These acts and omissions by Defendants, M.A., alleges, facilitated the sex trafficking venture."); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257 (M.D. Fla. 2020) (cited by Judge Jordan in *Red Roof*) (finding the participation element satisfied because the complaint alleges "**<u>the rooms rented</u>** for plaintiffs and their traffickers" and "food and beverage sales and ATM fees from those persons who were engag[ed] in sex trafficking") (emphasis added in both).

Finally, this Court's decision in *K. H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024) (unpublished), doesn't support the district court's decision. The complaint in *Riti* was much like the complaint in *Red Roof*—both defined and alleged the venture only as a *sex-trafficking* venture. *See Riti*, 2024 WL 505063, at *3 ("K.H.'s allegations are much like the allegations ... in *Red Roof*. K.H. alleges that Riti participated in a common **<u>sex trafficking</u>** undertaking with Laye ....") (emphasis added). In contrast, "this definition of the venture differs from that provided by [C.B.]." R-164 at 36 n.28. This difference in how C.B. has

argued the venture—the rental of rooms—compared to how the plaintiff in *Riti* argued the venture—a sex-trafficking business—by itself distinguishes *Riti*.

### D. Even if more were required, Naseeb directly assisted Chappell in other ways.

Even if C.B. were required to provide evidence that Naseeb "took any action to support or facilitate Chappell's specific [trafficking] activities, beyond allowing him to purchase the room rental," R-164 at 40, Naseeb *did* support or facilitate Chappell's trafficking beyond the room rentals.

Naseeb directly assisted Chappell's trafficking activities by assigning all sex offenders, including Chappell, to the same area of its hotel; by directing its housekeepers to enter the rooms of sex offenders and prostitutes only once a week; and by not reporting prostitution to the police but only within Naseeb. *See, e.g.*, R-131 at 41-42; R-133 at 32, 35-36, 78; R-134 at 44-45, 51, 57; R-144 at 78, 82-83. Indeed, Chappell specifically told Naseeb's housekeeping not to clean his second room, which he was renting nightly, and housekeeping complied. *See* R-123 at 72.

As the district court expressly recognized, "[t]he testimony indicates that [Naseeb] permitted, if not explicitly endorsed, housekeeping and room assignment practices that **enabled** prostitution." R-164 at 39 (emphasis added). Given that recognition, it's unclear why or how the district court then concluded that there's no evidence that Naseeb "took any action to support or facilitate Chappell's specific activities." *Id.* at 40. Naseeb's housekeeping and room assignment policies,

which were designed to "get these girls back up here working," R-134 at 47, are precisely the actions that supported and facilitated Chappell's trafficking.

**2.   C.B. satisfied the fourth element—Naseeb's knowledge that the venture engaged in <u>an act</u> violating the TVPRA.**

**A.   The phrase "knew or should have known" must be given its plain meaning.**

In *Red Roof*, this Court held that the fourth element of a TVPRA claim against a beneficiary requires that "the defendant must have either actual or constructive knowledge that the venture ... violated the TVPRA." 21 F.4th at 725. The Court then gave those words their plain meaning. "Knowledge requires '[a]n awareness or understanding of a fact or circumstance.'" *Id.* (quoting Black's Law Dictionary (11th ed. 2019)). "Constructive knowledge, on the other hand, is that knowledge which 'one using reasonable care or diligence should have.'" *Id.* (quoting Black's Law Dictionary (11th ed. 2019)).

Thus, a hotel operator "may be liable under the TVPRA if they have either actual or constructive knowledge that the venture in which they participated and from which they benefited violated the TVPRA." *Id.* "This is a **negligence** standard ...." *Salesforce.com*, 76 F.4th at 555 (emphasis added).

**B.   Naseeb should've known Chappell was engaged in trafficking.**

Here, a jury could properly find that, if Naseeb had been using reasonable care or diligence, it would've learned that Chappell was engaged in trafficking in

violation of the TVPRA. Among other things, Naseeb knew that Chappell was a sex offender on probation, knew that he rented a second room on a nightly basis and told housekeeping not to clean that second room, and knew that trafficking was rampant at the Hilltop Inn. Those were all red flags that should've alerted Naseeb to investigate Chappell further.

As C.B.'s expert, Alan Tallis, opined, it was "**The Bright Red Flag**" for Naseeb to allow "**Rental of an Adjoining Room to a Sex Offender**." R-120-17 at 18. "You don't rent an adjoining room to a known sex offender without making appropriate inquiry for the reasons a second room was needed," and "all staff should be alerted to watch for potentially criminal activity." *Id.*

And if Naseeb's staff had been watching for suspicious activity—rather than having been directed to ignore it—Naseeb would've learned of Chappell's trafficking. A jury could properly find that Naseeb would've noticed four different Johns, as well as Chappell, going in and out of a fifteen-year-old girl's room in a 24-hour period, sex loud enough that it could be heard from outside, and suspicion enough that someone called C.B.'s room to see if she was okay. *See, e.g.*, R-123 at 57-73.

## C. Awareness that Chappell was specifically trafficking C.B. isn't required to show Naseeb's knowledge.

Notwithstanding this evidence, the district court held that it was "unable to find that there is a genuine issue of material fact as to whether [Naseeb] knew or should have known of *this Plaintiff's* trafficking." R-164 at 41. In the next subsec-

tion, we'll show why that's factually incorrect; Naseeb should've known that Chappell was specifically trafficking C.B. But, for now, that's not legally required.

To be sure, that is how this Court stated the fourth element in *Red Roof*: "(4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA **as to the plaintiff**." 21 F.4th at 726 (emphasis added).

But that statement is non-binding *dictum*. This Court never reached and decided any question regarding the fourth element in *Red Roof* because it found that the Does hadn't plausibly alleged the *second element*—participation—and then never decided whether the Does had plausibly alleged the fourth element—knowledge. *See, e.g.*, 21 F.4th at 724 ("Most of the parties' dispute concerns the second element—to knowingly benefit *from participating in a venture*.").

Thus, anything *Red Roof* says about the fourth element is non-binding. And it doesn't matter that the Court prefaced its description of the four elements with the words "[w]e hold ...." *Id.* at 719. "[A] judge ... cannot transmute dictum into decision by waving a wand and uttering the word 'hold.'" *United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring). "To the extent [an] opinion says one thing but does another, what it does is the holding of the decision." *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1265 (2007).

Those rules regarding *dictum* make good sense. Because the parties and the Court were focused on the second element, *Red Roof* overlooked the fact that the

words "as to the plaintiff" simply don't exist in the plain language of Section 1591.

Indeed, courts have described this requirement as "atextual" and against the "greater weight of authority." *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235, 2024 WL 4204906, at *4 (E.D.N.C. Sept. 16, 2024).

And when the Seventh Circuit addressed this question in binding precedent, it found the textual evidence rejects any such plaintiff-specific requirement:

> As for "an act," Salesforce's reading is contrary to the statutory text and overlooks differences between the two sections. **If Congress had meant in Section 1595 that the participant must have had actual or constructive knowledge of the specific victim, it could have simply said so. It did not**. Facing statutory text that does not say what it prefers, Salesforce asks us to make two interpretive moves to reach that result. First, Salesforce asks us to read "*an* act" of sex trafficking as "*the* act" of victimization that allowed the plaintiff to bring suit under Section 1595. **Salesforce then asks us to assume that knowledge of *the act* means knowledge of the *specific victim*. This goes two bridges too far. We see no reason to rewrite the statutory text by substituting "the" for "an."** Even if we were willing to take that first step, we would still see no reason to require knowledge of a particular act to require knowledge of the victim's identity. Salesforce is arguing, in effect, that the larger the sex-trafficking venture and the more extensive its participation in the venture—and so the less likely it is to have known the specifics of individual victims—the harder it should be for a victim to obtain civil relief.
>
> ....
>
> **If such specificity were required, Section 1595 would be severely undermined in some of the most egregious cases. A company like Salesforce could simply bury its head in the sand with respect to individual victims**. It could work, for example, only with high-level data on behalf of a venture that the company knows or should know is engaged in illegal sex trafficking on a large scale. By way of analogy, a taxi service transporting trafficking victims on behalf of traffickers

could claim that it lacked constructive knowledge where it knew that it was generally transporting trafficking victims so long as the drivers were shielded from seeing who specifically was in the back of their taxis. Or consider a prostitution ring that hires a construction company to build a better brothel, one that attracts more customers and is better insulated from the prying eyes of law enforcement. The contractor knows that the business is generally engaged in sex trafficking, but so long as the contractor does not know of any individual victim, it would be insulated from civil liability. In other words, **the larger the sex-trafficking venture, the less likely a victim would be able to prove sufficient knowledge. Nothing in the statutory text requires such an odd result.**

*Salesforce*, 76 F.4th at 557 (emphasis added).

In short, this Court should reject the *dictum* from *Red Roof* and follow "the majority of courts that have addressed Section 1595's constructive-knowledge requirement that the statutory text does not require allegations and ultimately proof that the defendant knew or should have known of the specific victim who has brought the civil action." *Id.* at 558. "To state a claim under Section 1595, a plaintiff needs to allege plausibly that the defendant had constructive knowledge that a venture *generally* has violated Section 1591. Knowledge of the specific victim, let alone knowledge of her identity is not required." *Id.* (cite omitted).

### D. Even if it were required, Naseeb also should've known that Chappell was specifically trafficking C.B.

Finally, even if specific knowledge were required, Naseeb also should've known that Chappell was specifically trafficking C.B. In addition to the fact that Naseeb should've known that Chappell was engaged in trafficking at the Hilltop

Inn, one of Naseeb's housekeepers saw C.B. outside of Chappell's second room with a John, another John had such loud sex with C.B. in that second room that it could be heard in other rooms, and C.B.'s presence with Chappell on Naseeb's premises was so suspicious that another guest called that second room to see if C.B. was okay. From that evidence, a jury could find that Naseeb should've known that Chappell was specifically trafficking C.B.

For example, while Naseeb has argued that it's housekeeper only saw C.B. for "a few seconds," R-123 at 72-73, it's for a jury to decide whether—in light of everything else Naseeb's housekeepers knew and were told—that should've given them notice that C.B. was being trafficked. C.B. was a *fifteen-year-old* black girl who had been brought and supervised by a *forty-eight-year-old* white man. Those circumstances were suspicious enough that "[s]omeone had called [C.B.'s room] ... and asked was [she] okay." R-123 at 69. They also asked if C.B. was "with a white man"—*i.e.*, they asked the obvious question: Why was C.B., a fifteen-year-old black girl, with Chappell, a forty-eight-year-old white man at the Hilltop Inn?

A jury could find that the only reason that Naseeb's housekeeper didn't say anything and literally turned her eyes away was because Mr. Amin told Naseeb employees that "**[w]e need the money**" and "[t]he only way you going to make some money, **you got to get these girls back up here working**." R-134 at 22, 47 (emphasis added). Had Naseeb exercised ordinary care, its housekeepers likely

would've further investigated, called the police, and taken other steps to find out that Chappell, who Naseeb knew was a sex offender, was trafficking C.B.

## Conclusion

The Court should reverse the district court's summary judgment in favor of Naseeb. Signature and certificate pages follow.

Appellant-Plaintiff C.B. submits this brief on January 3, 2025.

**/s/ Naveen Ramachandrappa**

Matthew B. Stoddard
Ga. Bar No. 558215
Belle-Anne B. Cooper
Ga. Bar No. 561983
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
Tel: 470-467-2200
Fax: 470-467-1300
*matt@legalhelpga.com*
*ba@legalhelpga.com*

Naveen Ramachandrappa
Ga. Bar No. 422036
Amber D. Greenaway
Ga. Bar No. 401191
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
Tel: 404-881-4100
Fax: 404-881-4111
*ramachandrappa@bmelaw.com*
*greenaway@bmelaw.com*

*Attorneys for Appellant-Plaintiff C.B.*

## Certificate of Compliance

I certify that this brief complies with the type-volume limitation of Rule 32 (a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains a total of 9,456/13,000 words, excluding the parts of the brief exempted by Rule 32 (f) and Eleventh Circuit Rule 32-4.

I also certify that this brief complies with the typeface requirements of Rule 32 (a)(5) and the typestyle requirements of Rule 32 (a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

I've made this certification on January 3, 2025.

**/s/ Naveen Ramachandrappa**

## Certificate of Service

I certify that, on January 3, 2025, I filed **Appellant-Plaintiff C.B.'s Principal Brief** using the ECF system, which will generate notice and serve this document on the following counsel:

*Attorneys for Appellant-Defendant Naseeb Investments, Inc.*

Kori Wagner
Tracy Anne Gilmore
Swift, Currie, McGhee, Heirs, LLP
1420 Peachtree Street NE, Suite 800,
Atlanta, GA 30309
Tel: 404-888-6191
*kori.wagner@swiftcurrie.com*
*tracy.gilmore@swiftcurrie.com*

Laurie Webb Daniel
Jonathan Spital
Webb Daniel Friedlander
75 14th St NE, Ste 2450
Atlanta, GA 30309
Tel: 678-935-0144
*laurie.daniel@webbdaniel.law*
*jonathan.spital@webbdaniel.law*

**/s/ Naveen Ramachandrappa**