**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 25-10816

————————————————

A.G.,

*Plaintiff-Appellant,*

*versus*

NORTHBROOK INDUSTRIES, INC.,
d.b.a. United Inn and Suites,

*Defendant-Appellee.*

————————————————

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-05231-JPB

————————————————

————————————————

No. 25-10829

————————————————

G.W.,

*Plaintiff-Appellant,*

2                        Opinion of the Court                        25-10816

*versus*

NORTHBROOK INDUSTRIES, INC.,
d.b.a. United Inn and Suites,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-05232-JPB
_____
_____

No. 24-13294
_____

C.B.,

*Plaintiff-Appellant,*

*versus*

NASEEB INVESTMENTS, INC.,
d.b.a. The Hilltop Inn,
a.k.a. Econolodge,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-04213-AT
_____

25-10816                    Opinion of the Court                    3

Before WILLIAM PRYOR, Chief Judge, ABUDU, Circuit Judge, and CONWAY,[*] District Judge.

ANNE C. CONWAY, District Judge:

In these consolidated appeals, we clarify what is required for a civil beneficiary claim under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a). Two minor females, A.G. and G.W., were sex trafficked through several hotels in Atlanta, Georgia, but their traffickers returned to only one hotel three times: United Inn and Suites ("United Inn"). United Inn is owned and operated by Appellee Northbrook Industries, Inc. ("Northbrook").[1] A.G. and G.W.'s traffickers spent fifteen to twenty minutes each day at United Inn conversing with the front desk staff. When A.G. and G.W. were locked out of their traffickers' hotel room, one of their traffickers persuaded an employee over the phone to readmit A.G. and G.W. to the room even though they did not produce any identification, and their names were not on the reservation.

Another minor female, C.B., was sex trafficked by Timothy Chappell ("Chappell"), a registered sex offender, at The Hilltop Inn ("Hilltop Inn"), which is owned and operated by Appellee Naseeb

---

[*] The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

[1] Northbrook is the appellee in Case No. 25-10816 and Case No. 25-10829.

Investments, Inc. ("Naseeb").[2] Chappell was a weekly renter at Hilltop Inn. Naseeb moved Chappell to a room in the area where other sex offender tenants were placed, rented him a second next-door room for a nightly rate, and followed his instructions not to clean his second room.

In their respective district court actions, A.G., G.W., and C.B. asserted beneficiary claims against the hotel operators. A.G. and G.W. also asserted negligence claims under Georgia common law against Northbrook. Summary judgment was granted for the hotel operators in all three actions. Because A.G., G.W., and C.B. each provided sufficient evidence to get to a jury on their claims, we vacate and remand.

## I. BACKGROUND

As required at the summary judgment stage, we view all facts and draw all reasonable inferences in favor of the non-movants, A.G., G.W., and C.B. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citation omitted). We begin by summarizing the underlying facts and proceedings of A.G. and G.W.'s beneficiary and negligence claims against Northbrook.

*A. A.G. and G.W.*

1. United Inn

Tahir Shareef ("Shareef") and Harsimran Sabharwal own Northbrook, which has owned and operated United Inn since 2006.

---

[2] Naseeb is the appellee in Case No. 24-13294.

United Inn is located in Decatur, Georgia. Shareef manages the day-to-day operations of United Inn, including payroll, mainte-nance, housekeeping, and the front desk. Shareef has lived in a one-bedroom apartment at United Inn for fifteen to twenty-five days per month since 2006.

A few of Northbrook's business practices are noteworthy. Shareef did not always conduct background checks on employees. Northbrook paid many employees in cash under the table, and did not know some employees' last names. In 2018, Dekalb County cited United Inn for 447 code violations. Under Georgia law, United Inn was required to post an anti-trafficking notice, which provided a hotline number for victims to call for help. O.C.G.A. § 16-5-47(d)(1); GEORGIA BUREAU OF INVESTIGATION, HUMAN TRAFFICKING NOTICE REV. 1.13.21, https://perma.cc/BT5K-UZ75. However, from 2017 to 2019, United Inn failed to post any anti-trafficking notice.

Crime was not uncommon at United Inn. It is in a "high crime area." Many arrests were made for narcotics and prostitution at the hotel. According to Sergeant C.D. King ("Sergeant King") for the Dekalb County Police Department's vice unit, United Inn was one of the problem hotels in DeKalb County and it had a "number of" women engaging in commercial sex between 2015 and 2021, as well as pimps with multiple women working for them. While working undercover, Sergeant King frequently came across adver-tisements for commercial sex at United Inn's address on a popular

commercial sex website called "Backpage." This included adver-
tisements for commercial sex with trafficked minors.

United Inn had thirty-six security cameras angled at its com-
mon areas and parking lots. The front desk staff were able to view
the video feeds. Shareef hired two security guards who alternated
shifts from 10 p.m. to 2 a.m. Shareef admitted that he did not hire
more security even though Dekalb County police recommended
that he do so to combat the prostitution at United Inn.

### 2. The Trafficking of A.G. & G.W. at United Inn

When A.G. and G.W. were seventeen years old, they were
put into contact with Zaccheus Obie ("Obie") through Obie's
cousin. A.G. and G.W. believed Obie would help them earn money
by dancing at strip clubs in Atlanta. On the night of June 22, 2017,
Obie sent Kikia Anderson ("Anderson") to transport A.G. and G.W.
from where they lived in Commerce, Georgia to Atlanta. Anderson
dropped them off at a hotel on Fulton Industrial Boulevard in At-
lanta. They spoke with Obie over the phone, and he told them that
he was watching them, and they needed to walk the streets to make
money by selling commercial sex. They complied.

The next morning, Obie collected A.G. and G.W.'s earnings
and claimed he was saving to buy them a house. Obie then drove
them to United Inn, where his associate, Dontavis Carr ("Carr"),
checked them in. They spent the following three days and nights
at United Inn engaging in commercial sex.

Obie expected A.G. and G.W. to earn at least $500 per day.
Each morning, Obie would collect their earnings and disappear for

fifteen to twenty minutes, presumably to visit the front desk and pay for their room. During their stay at United Inn, A.G. and G.W. purchased snacks and condoms from the lobby convenience store. They found "customers" in the street and the United Inn parking lot. They also loitered in the hotel common areas and wore provocative clothing.

During the three nights A.G. and G.W. spent at United Inn together, A.G. had commercial sex with approximately fifteen men. G.W. had commercial sex with approximately thirty men at United Inn, including the two times she returned to United Inn in July 2017. Around 7:00 p.m. on June 24, 2017, A.G. and G.W. engaged in commercial sex with a group of six men in their hotel room. After they kicked the men out, the men yelled and banged on their room door for fifteen to twenty minutes. Later that night, they engaged in commercial sex and argued with a different group of four to five men after one of the men slapped A.G.

During the night of either June 24 or June 25, A.G. and G.W. were locked out of their room and called Obie. Then, Obie spoke to the United Inn front desk employee over the phone, and the employee walked A.G. and G.W. back to their hotel room and unlocked it for them. The employee did so even though A.G. and G.W. did not produce any identification and were not listed on the reservation. Obie told A.G. and G.W. he did not want housekeeping cleaning their room, and housekeeping did not clean it during the three nights they spent at United Inn. Obie told A.G. and G.W. on multiple occasions that he was constantly monitoring them at

United Inn. According to A.G. and G.W., Obie, Carr, and Anderson each carried a gun.

On the night of June 25, A.G. and G.W. persuaded Obie to allow them to return home for a few days to see their families and promised they would return to work for him. The next morning, Anderson drove them back to Commerce. Obie returned to pick them up from A.G.'s home in Commerce on July 2, 2017, but A.G. did not show up. So Obie drove G.W. alone to United Inn, where she shared a room with two other trafficking victims. On July 4, Obie moved G.W. to a different hotel.

After staying in various hotels in Atlanta and returning to Commerce briefly, Anderson and Obie again brought G.W. and another trafficking victim back to United Inn on July 20. This time G.W. stayed in the "back side" of United Inn, where there were prostitutes and pimps who had their hotel room doors open and were talking in the hallway. During this stay at United Inn, G.W. recalled that she was solicited by one pimp and offered cocaine by another. G.W. also recalled that later that night, she was again locked out of her room and assisted by a United Inn employee. According to G.W., housekeeping similarly did not clean the room she was in for the additional three nights she spent at United Inn. G.W. left United Inn on July 21, 2017.

G.W. was rescued by the Federal Bureau of Investigation on July 23, 2017. Obie pleaded guilty to sex trafficking A.G. and G.W. and received a sentence of twenty years in prison. *United States v. Obie, et al.*, Case No. 1:18-cr-00424 (N.D. Ga., April 6, 2021), Doc.

178:1–2. Out of the four nights that A.G. was trafficked by Obie, she spent three of those nights at United Inn. Out of the approximate twenty nights that G.W. was trafficked by Obie, she spent six of those nights at United Inn. United Inn was the only hotel Obie returned to three times while trafficking A.G. and G.W.

### 3. Procedural History

A.G. and G.W. filed nearly identical complaints against Northbrook on December 28, 2020. They each asserted a beneficiary claim under § 1595 and a negligence claim under Georgia common law against Northbrook. Northbrook moved to dismiss both cases for failure to state a claim. The district court deferred its decision until we decided *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021), then it denied Northbrook's motions to dismiss. The district court ruled that A.G. and G.W. had sufficiently alleged Northbrook's "participation in a venture" because they alleged that Northbrook "had rented a room to [their] trafficker in the past for the purpose of sex trafficking" and that Northbrook "knew or should have known" that he was trafficking them.

On December 12, 2023, A.G. and G.W. moved for discovery sanctions. Northbrook had produced an admittedly "deficient" response to written discovery requests seeking, among other information, the names of United Inn employees. Northbrook had also missed discovery deadlines and produced important documents after the close of discovery.

On December 21, 2023, Northbrook moved for summary judgment in both cases. On June 13, 2024, the district court granted

Northbrook's motions for summary judgment. The district court ruled that A.G. and G.W. failed to prove that Northbrook participated in a venture with their traffickers because they had not shown that Northbrook "acted pursuant to the common goal of the trafficking venture" or "took steps with Plaintiff's traffickers to facilitate the traffickers' illicit activities." It also ruled against their negligence claims by reasoning that because they visited United Inn for an unlawful purpose (i.e., as minor sex trafficking victims) they were licensees, not invitees, and Northbrook thus benefitted from a higher liability standard.

A.G. and G.W. filed motions for reconsideration. They argued that Northbrook's discovery misconduct deprived them of an opportunity to contact former employees who may have substantiated their claims and should have prompted the district court to draw an adverse inference against Northbrook at summary judgment. On February 13, 2025, the district court denied the motions for reconsideration and granted the motions for sanctions against Northbrook for its discovery misconduct. A.G. and G.W. appealed.

## B. C.B.

### 1. Hilltop Inn

The Hilltop Inn property is located in Conley, Georgia, and has two buildings, both of which were operated as Hilltop Inn in 2010. One building was later branded an Econolodge, while the other building remains Hilltop Inn. Naseeb has owned the Hilltop Inn property since 2006, and Naseeb is owned in part by Vic Amin

25-10816               Opinion of the Court                    11

("Amin"). Before and during June 2010, Amin oversaw the operations of Hilltop Inn, and the front desk was in the building that is now an Econolodge.

Amin testified that Hilltop Inn's policy required an employee who suspected commercial sex was taking place on the property to report it to him. According to Amin, if employees specifically noticed traffic in and out of a room or underaged girls, they were supposed to report it to him. However, Amin asserted that he never received any such reports, and he was unaware of the prostitution, sex trafficking, and sex offenders at Hilltop Inn.

Former employees' testimony suggests otherwise. The employees testified that not only did sex offenders live at Hilltop Inn, but they were also regularly placed in a specific area of the hotel. They also described many incidents involving narcotics, pimps, prostitutes, and underaged girls being sold for commercial sex at Hilltop Inn. And they testified that they reported these incidents to Amin. Additionally, Solomon Mustafa ("Mustafa") was convicted for trafficking three women at Hilltop Inn and other hotels between March and May 2010, a few weeks prior to C.B.'s arrival. *United States v. Mustafa*, Case No. 1:11-CR-234 (N.D. Ga., September 20, 2012), Doc. 159:1–2. Mustafa reportedly walked a trafficking victim who was duct taped and had sheets over her head through the common area of Hilltop Inn and forced her into the back of his car. (Pl.'s Resp. Br., Doc. 120 at 23 (citing Pl.'s Ex. 15, Excerpts from Mustafa federal criminal trial, Doc. 120-15)).

Joan Blackmon ("Blackmon"), a former housekeeper, testified that when she asked Amin why he rented rooms to prostitutes, he replied, "We need the money." According to Blackmon, Amin also said "[t]he only way you going to make some money, you got to get these girls back up here working." Blackmon testified that Amin told her to "restrict the amount of cleaning" in prostitutes' rooms and clean sex offenders' rooms once a week but give them towels daily. Blackmon also testified that while Amin owned Hilltop Inn, it sometimes rented rooms for fifteen to twenty minutes at a time.

### 2. The Trafficking of C.B. at Hilltop Inn

Chappell, a white forty-eight-year-old man, checked in to Hilltop Inn as a weekly renter on May 10, 2010. Chappell was a registered sex offender who had been recently released from prison on probation and was treating Hilltop Inn as his residence. Chappell initially stayed in Room 126 but he was moved to Room 254 in the building where other sex offenders were placed. On June 4, 2010, a probation officer called Hilltop Inn to verify Chappell's room change.

Chappell met C.B., a fifteen-year-old black girl, online by advertising a free room for a female on Craigslist. On June 21, 2010, Chappell paid Hilltop Inn to rent a second room next door to his room for a nightly rate. Amin admitted that renting Chappell a second room was a mistake. Also, according to C.B., Chappell told Hilltop Inn staff not to clean his second room, and no one did.

On the evening of June 21, Chappell paid someone to transport C.B. from her aunt's house to Hilltop Inn. Upon arrival, C.B. walked with Chappell up the stairs to his hotel room without entering the lobby. After approximately thirty minutes, Chappell took C.B. to her room and returned to his room. After C.B. entered her room, Chappell called and told her a man was coming to her room for sex to pay for the room. After the man left, Chappell called C.B. again to complain about the noise.

On June 22, Chappell paid to rent his second room for another night. Chappell told C.B. a second man would be coming to her room for commercial sex, but the second man changed his mind because he said C.B. looked underaged. At some point that day, Chappell raped C.B. in the second room. Chappell also told C.B. he was posting her photos online for commercial sex.

Later that day, a third man paid for commercial sex with C.B. Before the third man had commercial sex with C.B., she held open the door to her room while he inspected it. While holding open the door, C.B. made eye contact with a woman standing by a housekeeping cart for a few seconds. C.B. asked the third man for help, but he said he could not help her until later that day. Then, a fourth man paid for sex with C.B. and "got loud" with her when she refused to drink his liquor.

Chappell's probation officer and DeKalb County police visited Chappell's room twice that afternoon. The officers searched Chappell's room and found suspected child pornography. Chappell

told C.B. to be quiet during these visits, and she never saw the officers. Chappell later told C.B. the officers found a photo of her on his computer which was considered a violation of his probation.

That evening, C.B. persuaded the third man who paid for commercial sex with her to return to Hilltop Inn and drive her back to where her aunt lived. Chappell left Hilltop Inn on June 23. Chappell pleaded guilty to sex trafficking C.B. and received a sentence of twenty years in prison. *United States v. Chappell*, Case No. 1:10-cr-00531 (N.D. Ga. Apr. 16, 2012), Doc. 73-1; Doc. 76 at 2.

### 3. Procedural History

C.B. sued Naseeb on October 13, 2020. In her amended complaint, C.B. asserted two counts under § 1595(a): "civil beneficiary sex trafficking" and "civil beneficiary labor trafficking." On August 16, 2022, Naseeb moved for summary judgment.

On September 12, 2024, the district court granted Naseeb's motion because C.B. failed to prove a "genuine issue of material fact as to the second and fourth elements of the . . . civil beneficiary provision." It ruled that C.B. failed to provide evidence that Naseeb "took any action to support or facilitate Chappell's specific activities, beyond allowing him to purchase the room rental." It also ruled that C.B. failed to show that Naseeb "knew or should have known that [C.B.] was being trafficked." C.B. appealed.

## II. STANDARD OF REVIEW

We review a "grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Strickland*, 692 F.3d at 1154 (citation

omitted). Summary judgment is appropriate when there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1177 (11th Cir. 2020) (citation omitted).

## III. DISCUSSION

We divide our discussion into four parts. First, we provide a general background on beneficiary claims and clarify the second and fourth elements of a beneficiary claim, "participation in a venture" and knowledge. Second, we explain that A.G. and G.W. produced sufficient evidence to survive summary judgment as to their beneficiary claims because they established "participation in a venture." Third, we explain that C.B. also produced sufficient evidence to survive summary judgment because she established "participation in a venture" and knowledge. Fourth, we explain that A.G. and G.W. produced sufficient evidence for their negligence claims to survive summary judgment because there is a dispute of fact as to whether they were invitees at United Inn.

### A. Beneficiary Claims

The TVPRA, 18 U.S.C. § 1591, criminalizes various acts involved in the sex trafficking of minors or adults by force, fraud, or coercion. Section 1591 also criminalizes the act of knowingly benefiting from and knowingly assisting, supporting, or facilitating sex trafficking. 18 U.S.C. § 1591(a), (e)(4). In 2003, Congress amended the TVPRA to create a civil cause of action by which trafficking

16                          Opinion of the Court                    25-10816

victims may sue "perpetrator[s]" in federal court for damages. Pub. L. 108-193, sec. 4(a), 117 Stat. 2875, 2878. In 2008, Congress expanded the civil cause of action in § 1595, which now provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (**or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter**) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (2022) (emphasis added); Pub. L. 110-457, § 221, 122 Stat. 5044, 5067.

We refer to the additional claim against "whoever knowingly benefits" as a "beneficiary claim." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). In *Red Roof*, we broke the beneficiary claim down into four elements:

> (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that

> the undertaking or enterprise violated the TVPRA as
> to the plaintiff.

*Id.*

Only two of the elements of a beneficiary claim are disputed in this consolidated appeal: "participation in a venture" and knowledge.

### 1. "Participation in a Venture"

The "participation in a venture" element of a beneficiary claim is defined by the holding of *Red Roof*, which is binding precedent in this Circuit. *Red Roof* held that the plain meaning of "participation in a venture" in § 1595 requires a showing that a defendant "took part in a common undertaking or enterprise involving risk and potential profit." *Red Roof*, 21 F.4th at 725.

The circuits are split over how to interpret "participation in a venture" in § 1595. The D.C. Circuit shares our interpretation and defines participation in a venture as "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain." *See Doe 1 v. Apple, Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024). The First and Tenth Circuits transposed the definition of "venture" under § 1591, which is a "group of two or more individuals associated in fact," to § 1595's "participation in a venture." *Bistiline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019); *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017). The Seventh Circuit utilized § 1591's statutory definition of "venture" as an "upper limit[]" for § 1595. *G.G. v. Salesforce.com*, 76 F.4th 544, 559 (7th Cir. 2023). It held that § 1595's "venture" can be no "more demanding" than §

1591's "venture," and participation under § 1595 "requires only a desire to promote the wrongful venture's success." *Id.* at 554, 559. In contrast, we declined to transpose § 1591's definition of "venture" to § 1595 because § 1591 clearly states that its definition applies only "[i]n this section" and to do so would render the "should have known" language in § 1595 "superfluous." *Red Roof*, 21 F.4th at 724.

The varying interpretations of "participation in a venture" may produce inconsistent results. Requiring a showing that a defendant took part in a common undertaking or enterprise involving risk or potential profit necessarily dictates that "observing something is not the same as participating in it." *See Red Roof*, 21 F.4th at 727. To be liable under § 1595, defendants must take part in a common enterprise to the extent that they share legal risks and potential profits with traffickers. *See id.* at 725. Although the Seventh Circuit does not share our interpretation of participation in a venture, it appears to agree with the principle that observation is not participation under § 1595. *See Salesforce*, 76 F.4th at 563–64 (reading § 1595's "participation in a venture" "to require more than what *Twitter* called 'mere passive nonfeasance' or an 'arm's length, passive, and largely indifferent' relationship" with a trafficker) (citing *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 500 (2023)). However, by not requiring a showing of shared profits and risks, the First, Seventh, and Tenth Circuits' interpretations of "participation in a venture" allow courts to circumvent this principle in future decisions. Following their logic, some courts have erroneously concluded that the provision of standard commercial services to traffickers, when

paired with knowledge of their activities, adds up to "participation in a venture." *See, e.g.*, *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1187 (D. Colo. 2025) (describing the theory that "alleging a continuous business relationship" between an alleged beneficiary and a trafficker, when the beneficiary "knew or should have known" of the trafficking, amounts to participation in a venture).

Appellants urge this Court to adopt that theory and to hold that merely renting a hotel room to traffickers, coupled with constructive or actual knowledge of sex trafficking, constitutes "participation in a venture." Under our precedent that cannot be. *Red Roof* held that franchisors financially benefitting from renting rooms to sex traffickers alone does not amount to "participation in a venture." *Red Roof*, 21 F.4th at 727. Whether a defendant is a hotel operator or franchisor is not material. Merely renting a hotel room to a trafficker with actual or constructive knowledge of his trafficking does not constitute "participation in a venture" as defined by *Red Roof*. To share legal risks and profits with a perpetrator under the TVPRA, "something more than engaging in an ordinary buyer-seller transaction is required[.]" *Apple*, 96 F.4th at 415.

Appellants point out that here their traffickers profited from sex trafficking them in hotel rooms while risking losing access to the rooms or being caught, and the hotel operators profited from the room rentals while risking damages to their property. The problem is that none of these potential profits or risks are common to both the traffickers and the hotel operators. Mere "arms-length

transaction[s]" are simply not enough involvement to constitute "participation in a venture." *Apple*, 96 F.4th at 415.

Admittedly, our requiring "something more" than an arms-length transaction is not very illuminating guidance. *Id.* This is a fact-specific inquiry that courts must engage in when evaluating beneficiary claims. For instance, "something more" may include offering "personalized support" to a sex trafficker. *See Salesforce*, 76 F.4th at 563. As explained below, this consolidated appeal provides examples of facts which satisfy the "participation in a venture" requirement.

The parties also dispute whether the alleged "venture" in a beneficiary claim must be a "sex trafficking venture." This issue is not dispositive in this consolidated appeal. Nonetheless, we note that nothing in the plain language of § 1595(a) requires that the "venture" be a "sex trafficking venture." Section 1595(a) reads: "participation in a venture which that person knew or should have known *has engaged in an act in violation* of this chapter." 18 U.S.C. § 1595(a) (emphasis added). It does not read "participation in a venture which that person knew or should have known [*is*] a violation of this chapter." Of course, regardless of the type of venture, it must "engage in an act in violation" of the TVPRA. *Id.* But that requirement does not dictate that the venture must primarily be a sex trafficking venture.

### 2. Knowledge

The knowledge element[3] of a beneficiary claim is defined by *Red Roof* as "constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Red Roof*, 21 F.4th at 726. Naseeb urges us to apply this definition and require a victim asserting a beneficiary claim to prove that a defendant possessed knowledge of a TVPRA violation specific to the victim suing. However, *Red Roof*'s definition of knowledge under § 1595 is non-binding dicta because *Red Roof* affirmed dismissal of the Does' beneficiary claims by determining that the Does failed to allege "participation in a venture." *Id.* at 726–27; *see Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1265 (11th Cir. 2007) ("To the extent our opinion says one thing but does another, what it does is the holding of the decision. '[J]udicial opinions do not make binding precedents; judicial decisions do.'") (citing *Dantzler v. IRS*, 183 F.3d 1247, 1251 (11th Cir. 1999)).

The plain language of § 1595(a) does not support *Red Roof*'s requirement that a victim asserting a beneficiary claim must prove a defendant's knowledge that the common enterprise engaged in a TVPRA violation *as to the victim*. Section 1595(a) does not say that. Instead, Congress chose to use the following language: "knew or should have known has engaged in an act in violation of this chapter." *Red Roof*'s reading of the knowledge element requires two leaps from the plain text of the statute: (1) "an act" in violation of

---

[3] The knowledge element is only disputed in C.B.'s case. The district court did not reach the knowledge element in A.G. and G.W.'s cases.

the TVPRA must be "the act" which rendered the plaintiff a victim able to sue under § 1595, and (2) knowledge of "the act" requires knowledge of the specific victim. *See Salesforce*, 76 F.4th at 556.

Naseeb relies on the dissent in *Salesforce*, which stated that "because § 1595 requires constructive knowledge of a § 1591 violation and a § 1591 violation requires knowledge of a specific victim, damages suits are available only when a plaintiff plausibly alleges that the defendant should have known that the venture engaged in her particular sex trafficking." *See id.* at 569 (Kirsch, J., dissenting). The causation in that statement is lost on us. We agree beneficiaries must know that a person was trafficked, and there is no such thing as a "general violation" of the TVPRA. *See id.* at 568. But we do not agree with the dissent's atextual requirement that beneficiaries must know the identity of the trafficking victim. It is obviously true that one may know of a TVPRA violation without knowing the identity of the victim. In this consolidated appeal, we know of at least three § 1591 violations even though Appellants chose to protect their identities throughout litigation. Thus, we decline to take two atextual and illogical leaps to impose an additional hurdle for trafficking victims asserting beneficiary claims to overcome. Section 1595's knowledge element requires constructive or actual knowledge that the undertaking or enterprise violated the TVPRA, nothing more.

### B. Summary Judgment Was Not Appropriate as to A.G. and G.W.'s Beneficiary Claims.

A.G. and G.W. produced sufficient circumstantial evidence for a reasonable jury to infer that Northbrook offered personal support to Zaccheus Obie's sex trafficking operation, which is enough to show "participation in a venture." To begin with, there is more than enough evidence to support an inference that United Inn was a sex trafficking-friendly hotel. Sergeant King testified that he investigated online advertisements for commercial sex with minors at United Inn. Also, A.G. and G.W.'s traffickers evidently favored United Inn; G.W. testified that it was the only hotel Obie returned to three times while trafficking her. United Inn admittedly did not follow the police's recommendation to hire more security and violated Georgia law by failing to post an anti-trafficking notice in its lobby. A.G. and G.W., while dressed provocatively, found "customers" in the hotel parking lot, loitered in the hotel common areas, and purchased goods from the lobby convenience store, including condoms. Also, there were two occasions where groups of men argued with A.G. and G.W. from the hallway and banged on their hotel room door. A reasonable jury could infer from this evidence that not only was United Inn friendly toward sex trafficking, but also that Northbrook had constructive or actual knowledge that A.G. and G.W. were being sex trafficked.

A hotel's general friendliness toward and awareness of sex trafficking, while deplorable, is not enough to establish "participation in a venture" under § 1595. However, we view this evidence in tandem with A.G. and G.W.'s testimony that "[t]he traffickers

would spend 15-20 minutes talking with hotel staff per day," and one night Obie persuaded a United Inn front desk employee over the phone to allow A.G. and G.W. back into the hotel room they were locked out of. G.W. testified that when she was locked out a second time at United Inn, once again one of her traffickers persuaded a United Inn front desk employee over the phone to allow her back into the hotel room. This is an example of "something more" than merely renting rooms to sex traffickers. A jury certainly could find it significant that United Inn allowed A.G. and G.W., two seventeen-year-old girls dressed provocatively who were loitering in common areas and purchasing condoms in the lobby, back into a room even though they produced no identification and were not listed on the room reservation.

Northbrook generally characterizes the inference that it participated in a venture as "speculation and conjecture." We disagree. A jury could reasonably infer based on the unusual occurrence when A.G. and G.W. were locked out paired with United Inn's apparent friendliness toward and awareness of sex trafficking on its property that United Inn supported and cooperated with Obie's sex trafficking operation.

The parties also dispute whether the district court should have considered Northbrook's discovery violations as a reason to deny summary judgment. Although A.G. and G.W.'s motions for sanctions included requests for an adverse inference at trial, they only requested an adverse inference at summary judgment in their

motions for reconsideration. Thus, this argument was forfeited because motions for reconsideration cannot raise arguments "that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005). However, because we are vacating summary judgment, we leave this evidentiary issue to the district court's discretion.

We acknowledge that A.G. and G.W.'s evidence of Northbrook's "participation in a venture" is not overwhelming. It does not need to be, and in cases where minor sex trafficking victims assert beneficiary claims we assume it rarely is. Based on the evidence, a jury could reasonably infer that Northbrook was supporting Obie's sex trafficking operation in more extensive ways than helping Obie ensure his victims returned to the hotel room they were being sex trafficked in. That is enough for A.G. and G.W.'s beneficiary claims to survive summary judgment. Accordingly, we vacate the summary judgment as to A.G. and G.W.'s beneficiary claims and remand for further proceedings.

### C. Summary Judgment Was Not Appropriate as to C.B.'s Beneficiary Claim.

A reasonable jury could find based on the evidence that Naseeb offered personal support to Chappell's sex trafficking operation, which is enough to establish "participation in a venture." A reasonable jury could also find that Naseeb knew or should have

known that Chappell was sex trafficking someone in his second next-door room, which he was renting by the night.[4]

## 1. C.B. Produced Enough Evidence to Establish "Participation in a Venture."

C.B. presented evidence that Hilltop Inn had a policy of encouraging prostitution and sex trafficking generally. Former employees testified that Hilltop Inn would routinely place sex offenders in the same area of the same building of the hotel. A jury could infer this placement was to protect sex offenders engaging in prostitution or sex trafficking from being reported by other guests. A former housekeeper testified that Amin instructed her to only clean sex offenders' hotel rooms once a week and limit how often she cleaned prostitutes' rooms. The former housekeeper also testified that Amin told her, "The only way you going to make some money, you got to get these girls back up here working."

Hilltop Inn having policies in place to facilitate sex trafficking, standing alone, is insufficient to establish Naseeb's "participation in a venture" under § 1595 because it does not show personal support of *Chappell*'s sex trafficking operation. However, the evidence that Naseeb applied those policies to Chappell to enable his

---

[4] The International Franchise Association attempts to raise a new issue in its amicus brief: whether C.B. satisfied the "knowingly benefit" element of § 1595(a). This issue was undisputed by the parties below and on appeal, and this Court "will not consider arguments raised only by amici." *Stanley v. City of Sanford*, 83 F.4th 1333, 1344 (11th Cir. 2023), *aff'd*, 606 U.S. 46 (2025) (citation omitted).

sex trafficking operation is sufficient to withstand summary judg-ment and is "something more" than merely renting a room to a sex trafficker. Prior to C.B.'s arrival, Naseeb moved Chappell, a regis-tered sex offender, to a room in the area where former employees testified that sex offenders were routinely placed. Then, Naseeb rented a second room by the night to Chappell, which was next door to his room. Amin admitted that renting Chappell a second room under these circumstances was a mistake. As for the cleaning policy, C.B. testified that Chappell instructed Hilltop Inn staff not to clean his second room, and no one did. A reasonable jury could find that Naseeb applied Hilltop Inn's room placement and clean-ing policies to Chappell to enable his sex trafficking operation.

Naseeb finds flaws in C.B.'s evidence. Naseeb points out that C.B. only uses the testimony of employees who worked at Hilltop Inn before C.B.'s arrival to establish Hilltop Inn's policies. Naseeb also provides expert testimony that the presence of registered sex offenders has no correlation with sex trafficking. These are argu-ments for a jury to consider in weighing the evidence presented, not for a court at summary judgment. The evidence of how Naseeb treated Chappell creates a dispute of fact as to whether Hilltop Inn continued to have the room placement and cleaning policies in place when C.B. arrived. As for the expert testimony, even assum-ing a jury finds it credible, it does not speak to whether Hilltop Inn routinely placed sex offenders in rooms in a specific area under the belief that those sex offenders were likely to engage in sex traffick-ing. Therefore, the evidence is sufficient to establish "participation in a venture."

2. C.B. Produced Enough Evidence to Establish Knowledge.

To prove knowledge under § 1595, C.B. did not have to prove that Naseeb had actual knowledge that Chappell was committing "an act in violation" of § 1591 (i.e., sex trafficking). Instead, C.B. could establish knowledge by proving that Naseeb had constructive knowledge that Chappell committed an act in violation of § 1591, which is "knowledge which 'one using reasonable care or diligence should have.'" *Red Roof*, 21 F.4th at 725 (citing *Constructive Knowledge*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Chappell, a registered sex offender who was a weekly renter at Hilltop Inn, requested to rent a second next-door room for a nightly rate. Chappell also requested that housekeeping not clean this second room. A jury could reasonably infer that Chappell's requests should have been a red flag to Naseeb, especially given that Amin admitted that the second room rental was a mistake. If Naseeb had paid attention, it would have noticed five different men, including Chappell, visiting a fifteen-year-old girl in this second room, all within one night and day. This evidence alone requires the question of whether Naseeb has constructive knowledge of an act in violation of § 1591 to go to a jury. But C.B.'s evidence of constructive knowledge does not end there.

As the district court noted, C.B. produced evidence that Amin "was fully aware that his business was financially supported by allowing unfettered, ongoing prostitution on the property." The evidence showed that sex trafficking took place at Hilltop Inn, including as recently as a few weeks prior to C.B.'s arrival. A jury

could find that Hilltop Inn had a policy of turning a blind eye to sex crimes on its property and applied that policy to Chappell's second room rental. A jury could also find that a reasonable, diligent hotel operator would not operate this way.

Furthermore, C.B. testified that while the third man to visit her for commercial sex inspected her hotel room, she made eye contact with a housekeeper. The evidence shows that Amin's policy required his staff to report suspicious or criminal activity to him, including any underaged girls on the property. The evidence also supports a finding that C.B. looked her age. The second man to visit C.B.'s room for commercial sex reportedly changed his mind because he was concerned about her age. C.B. testified that someone called her hotel room to ask if she was okay and if she was with Chappell, and she suspected the caller was a man she briefly saw in the stairwell upon arrival at Hilltop Inn. Based on these facts, a jury could find that per Amin's policy, the unidentified housekeeper declined to report to anyone that a young-looking teenage girl was in the second room being rented by a sex offender by the night. After all, according to Amin, Hilltop Inn needed "to get these girls back up here working." A reasonable, diligent hotel operator would have actively encouraged and investigated such reports.

Again, Naseeb raises arguments for a jury to consider, not a court at summary judgment. This includes Naseeb's arguments that Chappell's sex offender status was not inherently suspicious, a

few seconds was not long enough for the housekeeper to have no-
ticed C.B. was in trouble, and the woman C.B. made eye contact
with may not have even been a housekeeper.

Naseeb also argues that the unidentified housekeeper's
knowledge cannot be imputed to Naseeb under Georgia law. This
argument misses the mark. The TVPRA does not incorporate
Georgia agency law, and instead refers to the common law term,
"constructive knowledge" generically. *See Nationwide Mut. Ins. Co.
v. Darden*, 503 U.S. 318, 322 (1992) ("[W]here Congress uses terms
that have accumulated settled meaning under . . . the common law,
a court must infer . . . that Congress means to incorporate the es-
tablished meaning of these terms[.]") (citations and internal quota-
tion marks omitted). Under common law, employees are agents
whose performance is controlled by a principal, and an agent's
knowledge is imputed to a principal if said knowledge "is material
to the agent's duties to the principal." RESTATEMENT (THIRD) OF
AGENCY §§ 7.07(3)(a), 5.03 (A.L.I. 2024). There is evidence that
Naseeb controlled its housekeepers' work, and that Amin in-
structed all staff to report suspicious or criminal activity. Thus, the
housekeeper was an agent whose knowledge may be imputed to
Naseeb.

The district court noted that "given the direction of the Elev-
enth Circuit's case law" it was "hard-pressed to envision a factual
scenario in which the Circuit would find constructive knowledge
sufficient to find a defendant liable as a civil beneficiary under §
1595." Indeed, it may be easier for a plaintiff to produce evidence

showing a beneficiary offered personal support to a venture engaging in a TVPRA violation where the plaintiff also has evidence of the beneficiary's actual knowledge of the TVPRA violation. However, this does not mean that beneficiary claims based on a beneficiary's constructive knowledge of a TVPRA violation will always fail. Based on the foregoing, C.B.'s claim relying on evidence of Hilltop Inn's constructive knowledge of Chappell's sex trafficking operation is an example of the very factual scenario the district court was concerned with.

In conclusion, a jury could reasonably infer that Naseeb provided personal support to Chappell's sex trafficking operation by applying its room placement and cleaning policies to Chappell, which is sufficient to establish "participation in a venture." A jury could also reasonably infer that Naseeb had constructive knowledge that Chappell was using his second room to engage in sex trafficking, which is sufficient to establish knowledge. These inferences are sufficient for C.B.'s beneficiary claim to survive summary judgment. Therefore, we vacate the summary judgment against C.B. and remand for further proceedings.

### D. Summary Judgment Was Not Appropriate as to A.G. and G.W.'s Negligence Claims.

Section 51-3-1 of the Official Code of Georgia provides:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his

> failure to exercise ordinary care in keeping the prem-
> ises and approaches safe.

O.C.G.A. § 51-3-1.

Courts refer to the guests described in section 51-3-1 as "in-vitee[s]." *See, e.g.*, *Tobar v. United States*, 696 F. Supp. 2d 1373, 1378 (S.D. Ga. 2009) (citing O.C.G.A. § 51-3-1). In Georgia, the test for invitee status is whether the purported invitee's presence is of "mutual benefit" to the invitee and the landowner. *Id.* (citations omitted). Landowners must protect invitees from injuries by third parties if they are reasonably aware of the probability of the injuries, and the injuries could have been avoided had the landowners exercised ordinary care and diligence. *Bishop v. Fair Lanes Ga. Bowling, Inc.*, 803 F.2d 1548, 1551 (11th Cir. 1986) (citations omitted). In contrast, under Georgia law a licensee is (1) "neither a customer, a servant, nor a trespasser," (2) has no contractual relationship with the landowner, and (3) is allowed to go on the premises merely for her own "interests, convenience, or gratification." O.C.G.A. § 51-3-2. Landowners are liable to licensees for only "willful or wanton injury." *Id.*

A.G. and G.W. produced sufficient evidence to create a jury question as to whether they were invitees. Northbrook stood to benefit from A.G. and G.W.'s presence. A.G. and G.W.'s presence allowed Northbrook to rent their hotel room to sex traffickers, and A.G. and G.W. were customers at the lobby convenience store. *See Anderson v. Cooper*, 104 S.E.2d 90, 94 (Ga. 1958) (holding that a child injured in a bakery was an invitee of the bakery because the bakery

attracted customers by allowing their children inside). Also, when A.G. and G.W. were locked out of their hotel room, United Inn staff allowed them back inside. A.G. and G.W.'s stay at United Inn was not merely for their own interests, United Inn could reasonably expect to benefit from their presence, and it did.

The district court agreed with Northbrook that A.G. and G.W. were at United Inn for an unlawful purpose because they were being sex trafficked and therefore were not invitees. But Georgia law merely requires that a landowner invite an invitee to his premises "for *any* lawful purpose." O.C.G.A. § 51-3-1 (emphasis added). A.G. and G.W. were not only engaging in commercial sex acts at United Inn. They were also guests of their traffickers, who were paying guests at United Inn, and they used guest services, including purchasing goods from the lobby convenience store. *See W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1381 (N.D. Ga. 2023) (holding that whether child sex trafficking victims were invitees or licensees was a jury question) (citing *McGarity v. Hart Elec. Membership Corp.*, 706 S.E.2d 676, 680 (Ga. Ct. App. 2011) ("Evidence of McGarity's status as an invitee was not nullified by evidence that he had a dual purpose for being on the property.")); *see also J.C. v. I Shri Khodiyar, LLC*, 624 F. Supp. 3d 1307, 1327 (N.D. Ga. 2022) (explaining that "in most circumstances, an invitee's guest stands in the invitee's shoes and is herself an invitee"). Thus, A.G. and G.W. were invited to United Inn in part for the lawful purposes of sleeping there and purchasing goods. They were also victims of illegal child sex trafficking at United Inn. One does not negate the other.

We address Northbrook's additional arguments in turn. First, it argues that because A.G. and G.W. were under the control of their traffickers at United Inn, they could not have been "induced or led" there by Northbrook. Not so. One may simultaneously be fully under the control of another and an invitee. *See Anderson*, 104 S.E.2d at 94 (holding that an infant fully controlled by his father was an invitee of a bakery).

Second, Northbrook argues that any invitation extended to A.G. and G.W. was limited in scope to the lobby. This argument ignores the fact that United Inn staff walked A.G. and G.W. back to the hotel room they were locked out of and unlocked the door for them. Thus, reasonable minds could differ as to the scope of United Inn's invitation, and this is a jury question. *See Wiggs v. Brunswick Cellulose LLC*, No. 2:23-CV-133, 2024 WL 5439691, at *5 (S.D. Ga. Nov. 26, 2024) (concluding that whether plaintiff exceeded the scope of his invitation to drop off a truck load was a jury question because of conflicting evidence of the scope of his invitation and his status) (citations omitted).

Third, Northbrook argues that A.G. and G.W. cannot recover against it because "[w]here a plaintiff has equal or superior knowledge of a dangerous condition" on a landowner's property, "there can be no recovery if the plaintiff fails to exercise reasonable care to avoid the danger." *Rice v. Six Flags over Ga., LLC*, 572 S.E.2d 322, 327 (Ga. Ct. App. 2002) (citations omitted). As an initial matter, equal or superior knowledge cannot bar A.G. and G.W.'s recovery if they did not voluntarily assume the risk of being sex trafficked at

25-10816              Opinion of the Court                    35

United Inn without coercion. *See Travis v. Quiktrip Corp.*, 794 S.E.2d 195, 199–200 (Ga. Ct. App. 2016). Considering that A.G. and G.W. were minors at the time and testified that their traffickers were armed and constantly monitoring them, the idea that they were voluntarily being sex trafficked is dubious, if not a legal impossibility. *See* O.C.G.A. § 16-5-46(a)(8)(B) (recognizing any minor involved in prostitution as a trafficking victim). Additionally, even if the superior knowledge rule applied, the extent of A.G.'s and G.W.'s knowledge of the danger and whether they exercised reasonable care is a question for a jury. *See Suresh & Durga, Inc. v. Doe*, 894 S.E.2d 602, 608 (Ga. Ct. App. 2023) (concluding that the extent of a sex trafficking victim's knowledge of the danger and reasonableness of her actions were jury questions).

Thus, A.G. and G.W. produced sufficient evidence for their negligence claims against Northbrook to survive summary judgment. Accordingly, we vacate and remand summary judgment as to A.G. and G.W.'s negligence claims as well.

## IV. CONCLUSION

We **VACATE and REMAND** for further proceedings consistent with this opinion.